## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SUEZETTE H. RICE, individually | : | Civil Action |
|  | : |  |
| Plaintiff, | : |  |
|  | : | No. 2:22-cv-874-RJC |
| v. | : |  |
|  | : | Judge Robert J. Colville |
| NATHAN RICE, INC., EDWARD R. RICE, | : |  |
| individually, as Trustee of the Sidney David | : |  |
| Rice Irrevocable Trust; THE SIDNEY | : | **JURY TRIAL DEMANDED** |
| DAVID RICE IRREVOCABLE TRUST; | : |  |
| WALNUT CAPITAL MANAGEMENT, | : |  |
| INC. d/b/a Walnut Capital Management; | : |  |
| HEMPSTEAD ROAD ASSOCIATES, a | : |  |
| Pennsylvania general partnership; GREGG | : |  |
| PERELMAN, individually; TODD | : |  |
| REIDBORD, individually; LOUIS PLUNG | : |  |
| & COMPANY LLP d/b/a Louis Plung & | : |  |
| Co.; MARC A. LEVINE, individually; and | : |  |
| JOHN DOES 1-10 | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

## AMENDED COMPLAINT

Plaintiff, Suezette H. Rice, by and through her undersigned attorneys, files this Amended Complaint against Defendants, Nathan Rice, Inc. (as a nominal defendant); Edward Rice, individually and as Trustee of the Sidney David Rice Irrevocable Trust; The Sidney David Rice Irrevocable Trust, dated November 2, 2015 (as a nominal defendant); Walnut Capital Management Inc.; Hempstead Road Associates; Gregg Perelman; Todd Reidbord; Louis Plung & Company LLP; Marc A. Levine, CPA; and John Does 1-10 (collectively "Defendants") and, in support thereof, avers as follows:

### I.   NATURE OF THE ACTION

1.   Plaintiff's claims in this action arise out of serious malfeasance and an unlawful

multi-faceted scheme devised and carried out by the above-captioned Defendants, together with their professional advisors, to "***out***" Plaintiff and her late father, Herbert L. Rice, from—and misappropriate or acquire for highly suppressed consideration—Plaintiff's valuable real property investment.[1]

2.      This action, and the facts underlying Plaintiff's causes of action set forth in this Amended Complaint, represent another regrettable episode in a long-running, messy family ordeal that relates—but is substantively and substantially distinct from—the claims, causes of action and relief sought in prior litigation involving Defendants Nathan Rice, Inc. and Defendant Edward Rice, on the one hand, and Plaintiff Suezette H. Rice and her late father, Herbert L. Rice on the other, namely (a) the tax dispute in *Edward Rice, Trustee et al. v. Herbert L. Rice*, Civ. Case No. 2:19-cv-00196-NBF, Feb. 7, 2019 (WDPA) ("Tax Dispute Action")[2], and (b) action for declaratory relief by plaintiffs thereto to confirm—on expedited basis pursuant to Fed. R. Civ. P. 57—the legal separation of the "HR Division" from NRI in *Herbert L. Rice et al. v. Nathan Rice, Inc. et al.*, Civ. Case No. 2:21-cv-00090-RJC, January 21, 2021 (WDPA) ("HLR Declaratory

---

[1] This statement actually is a literal admission and intended purpose stated by Defendant Todd Reidbord and his co-conspirator, Defendant Marc A. Levine, CPA, who was intimately involved in devising the unlawful and fraudulent scheme, admitting:

> I don't want to create problems (as we just want [Plaintiff] Suezette and Herb Rice out of NRI and this is the last piece), however they may think the valuation is too low.  I assume they will ask for the same and I just wanted to see the latest financials and fair market valuation for Hempstead Road Associates.  I won't provide this to [Plaintiff's attorney] Beth and/or [Plaintiff's late father] Herbert …

E-mail dated Sept. 14, 2020 from Marc Levine to Todd Reidbord.  And further:

> I don't want this to look like it is going through us.  Please email [Plaintiff's attorney] Beth and I directly that you've reconsidered some facts and you are willing to make the sale from NRI happen quickly.  ***Don't let them see our string of communications … please***.

*Id*. (emphasis added.)

[2] The first lawsuit between the Rice parties in 2019, only pertained to the payment of taxes arising due to the distribution of an unrelated property; issues relating to the Hempstead Road Associates were not addressed.

Action").

3.      As explained in detail below, the limited scope of the HLR Declaratory Action was to effectuate and declare that Herbert's interest is separate and apart from NRI in order to address the deficiency in NRI's Shareholder Agreement, which prevented Herbert and Plaintiff from filing their own "HR Division" corporate tax returns with the U.S. Internal Revenue Service ("IRS"). Notably, the HLR Declaratory Action included substantive claims against only Edward and NRI; Defendant Walnut Capital Management Inc. and Hempstead Road Associates were named and included only as nominal defendants "*in order to effectuate the necessary transfer of interest … and to secure the payment of all distributions prior and future* … ." (*See* HLR Decl. Action, ECF Doc. No. 74, at ¶ 28).

4.      Following commencement and in the course of discovery in the HLR Declaratory Action, a complex, multi-faceted scheme was discovered, which involved affirmative malfeasance and conspiracy by a number of other third parties, in addition to NRI and Edward Rice.

5.      Unfortunately, as reflected on HLR Declaratory Action's docket, the circumstances of the HLR Declaratory Action made it impracticable for plaintiffs in that action to significantly modify and expand the scope of that action from seeking the Court to confirm separation of Herbert's division of NRI from Edward and NRI, to pursuing causes of action sounding in conversion, tortious interference with contract, breach of fiduciary duties, and other affirmative malfeasance by third parties, because Herbert was then *ninety-six (96)* years old, in poor health and wanted a prompt resolution of NRI's separation in accordance with Rule 57 of Fed. R. Civ. P. Indeed, plaintiffs filed a Motion for Speedy Hearing pursuant to Rule 57 in HLR Declaratory Action and a Case Management Order with expedited deadlines was granted by the Court. (*See* HLR Decl. Action, ECF Doc. No. 29 and ECF Doc. No. 40).

6.      Unfortunately, due to various discovery delays and stalling tactics by the defendants, the Declaratory Action was not promptly resolved, Herbert departed this life on April 4, 2022, survived by Plaintiff (his daughter and beneficiary of the property investment interest at issue) and that action remains unresolved today where a motion for summary judgment is currently pending before the Court in HLR Declaratory Action.

7.      Following her father's death, after consulting independent counsel, Plaintiff seeks justice and compensation for monetary damages against the above-captioned Defendants arising out of the Defendants, and particularly, Defendants Reidbord, Perelman, Walnut Capital Management and their co-conspirators' material omissions, collusion and other minority oppressive actions, including for minority shareholder suppression, breach of fiduciary duties and acting in impermissible self-interest, tortious interference, all for Defendants' own personal gain and in contravention of their duties to Plaintiff and her late father.

8.      Moreover, during periods relevant to Plaintiff's claims in this Amended Complaint, Defendants continued to make false and misleading statements and/ or omissions in order to delay the exercise of Plaintiff's legal rights, all to the detriment of Plaintiff.

9.      Plaintiff now files this Amended Complaint to properly enumerate her claims and monetary damages and seek redress for claims that are wholly separate from those brought in the HLR Declaratory Action

## II.    THE PARTIES

10.      Plaintiff, Suezette H. Rice ("Plaintiff Rice"), is an adult individual and citizen of the State of Florida with an address at 7509 Rigby Court, Lakewood Ranch, Florida 34202.

11.      Plaintiff is (A) sole surviving joint tenant of the 5.99% undivided fee ownership interest in the Hempstead Property (as defined below), following the passing of her late father on

April 4, 2022, and (B) the owner of 458.6 shares, representing 45.86%, of the issued common capital stock of Defendant NRI (as defined below) following assignment of said shares on April 30, 2022, from her late father's trust dated March 7, 2019 to herself.

12.     Defendant, Walnut Capital Management Inc. ("Defendant WCM"), is a Pennsylvania corporation, doing business as Walnut Capital Management, with its principal place of business at 5541 Walnut Street, Suite 200, Pittsburgh, PA 15232.

13.     Defendant, Hempstead Road Associates ("HRA Partnership"), is an unincorporated general partnership formed and existing under the laws of the Commonwealth of Pennsylvania registered fictitious, doing business under registered fictitious name registered in this Commonwealth.

14.     The HRA Partnership owns numerous properties in the 14th ward of the City of Pittsburgh, Pennsylvania as evidenced by an indenture dated January 23, 1990 (Vol. 8189 Pg. 188-198) (collectively the "Hempstead Property").

15.     Defendant Todd Reidbord ("Defendant Reidbord"), is an adult individual with a primary place of business located at 5541 Walnut Street, Suite 200, Pittsburgh, PA 15232.

16.     At all times material hereto, Defendant Reidbord was the President and Founding Partner of Defendant WCM and also a Managing Partner of Defendant HRA Partnership.

17.     Defendant, Gregg Perelman ("Defendant Perelman"), is an adult individual with a primary place of business located at 5541 Walnut Street, Suite 200, Pittsburgh, PA 15232.

18.     At all times material hereto, Defendant Perelman was a principal and Chief Executive Officer of Defendant WCM and also a Managing Partner of Defendant HRA Partnership.

19.     Defendant Louis Plung & Company LLP ("Defendant LPC") (previously identified

as Doe 1-10), is a Pennsylvania limited liability partnership, with its principal place of business at 420 Fort Duquesne Blvd #1900, Pittsburgh, PA 15222.

20.     Defendant Marc A. Levine, CPA ("Defendant Levine") (previously identified as Doe 1-10), is an adult individual with a primary place of business located at 420 Fort Duquesne Blvd #1900, Pittsburgh, PA 15222.

21.     At all times material hereto, Defendant Levine was the Director of Tax at Defendant LPC, performed tax services for Defendant NRI on behalf of Defendant LPC.

22.     Defendant, Nathan Rice, Inc., is an incorporated business incorporated and existing under the laws of the Commonwealth of Pennsylvania ("Defendant NRI"), with its principal place of business at 2978 Beechwood Blvd., Pittsburgh, PA 15217.

23.     Defendant The Sidney David Rice Irrevocable Trust, dated November 2, 2015 ("SDR Trust"), is an irrevocable trust formed and existing under the laws of the Commonwealth of Pennsylvania, and has its situs in Pittsburg, Pennsylvania.

24.     Defendants NRI and SDR Trust are named as nominal parties as their respective rights will undoubtedly be impacted by the outcome of this litigation.

25.     Defendant, Edward R. Rice ("Defendant Edward Rice"), is an adult individual, residing at 2978 Beechwood Boulevard, Pittsburgh, Pennsylvania 15217. Defendant Edward Rice is named as a Defendant in this action in each of the following capacities: (i) in his individual capacity; (ii) in his capacity as the Trustee of the SDR Trust, and (iii) in his self-appointed purported capacity as President of Defendant NRI—which Plaintiff disputes.

26.     Defendants Doe 1-10, are upon information and belief, individuals and/or entities that actively participated, aided and abetted, and/or otherwise are liable to Plaintiff for the claims detailed herein.

### III.    JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332, as complete diversity of citizenship exists and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

28.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District, a substantial part of the property that is the subject of the action is situated in this District, and one or more Defendants reside within this District.

### IV.    FACTS RELATED TO ALL COUNTS

**A.  Origins of Nathan Rice, Inc., Restructuring & Shareholder Agreement**

29.    In or around 1969, Plaintiff's grandfather, Nathan Rice and his two sons, Herbert L. Rice (Plaintiff's late father) ("Herbert") and Sidney Rice (Defendant Edward Rice's father and Plaintiff's uncle) ("Sidney") formed and founded Defendant NRI.

30.    Following the death of Nathan Rice, Sidney and Herbert became the only remaining shareholders of Defendant NRI.

31.    In or around 2014, in connection with Defendant NRI's contemplated sale of a major real property asset and contemplated acquisition of another "like-kind" real property pursuant to the provisions of the Internal Revenue Code (IRC) Section 1031, Sidney and Herbert made and executed that certain Shareholder Agreement dated March 9, 2014 ("NRI Shareholder Agreement").  A true and correct copy of the NRI Shareholder Agreement is attached hereto as **Exhibit A**.

32.    The NRI Shareholder Agreement provided that Sidney Rice owned 540.14 shares, constituting 54.14% ownership interest, and Herbert L Rice owned 458.6 shares, constituting

7

45.86% ownership interest, of Defendant NRI's entire capital stock.  (Ex. A, first Whereas Clause)

33.     The primary purpose of the NRI Shareholder Agreement, upon advice and counsel from Attorney E.J. Strassburger, Defendant and accountant Howard Plung of Defendant LPC, was to separate Herbert's and Sidney's respective interests and other respective property and assets by creating two (2) separate and distinct divisions as part of the same corporate entity, specifically, the HR Division for Herbert, and the SR Division for Sidney.  (Ex. A, Sec. 1)

34.     The NRI Shareholder Agreement provided that each Shareholder (i.e., Herbert and Sidney) "shall be free to operate his division *without interference* or *oversight* from the other Shareholder, subject to the terms of [the NRI Shareholder Agreement]." (Ex. A, Sec. 1) (emphasis added)

35.     The NRI Shareholder Agreement further provides that "[e]ither Shareholder may at any time request that the assets (subject to the liabilities) of his division be transferred to him or his nominee. (Ex. A, Sec. 1)

36.     According to the NRI Shareholder Agreement, such "Shareholder would be responsible for, and would indemnify the other Shareholder for, any taxes payable with respect to such transfer" but there were no other conditions or requirements to effectuate such transfer. (Ex. A, Sec. 1)

37.     Notably, the NRI Shareholder Agreement was structured and prepared by Defendant NRI and Defendant Edward's counsel and accountant, Attorney E.J. Strassburger and Louis Plung, CPA, JD, an employee of Defendant LPC, respectively.

38.     Thereafter, Defendant LPC purported to prepare and file with the IRS two separate tax returns, one for Defendant NRI and another for HR Division, using NRI's federal employer and tax identification number ("EIN").

39.     By letter dated February 20, 2017, the IRS rejected Herbert's submitted tax return for tax year 2015, because the IRS would not distinguish between the "SR Division" and "HR Division" using the same EIN.

40.     The fact that Herbert could not file a separate, independent tax return for his HR Division, left him extremely vulnerable and at the mercy of the majority shareholder, who maintained unilateral control of NRI's affairs without adhering to any corporate formalities or sharing corporate books, records and other information with Herbert—in direct contravention of the expressly stated intent of the NRI Shareholder Agreement.

41.     After independent tax returns for the HR Division were rejected by the IRS, Herbert repeatedly sought that NRI implement a tax-free reorganization to alleviate the limitations resulting from the NRI Shareholder Agreement's inherent deficiency.

42.     However, such requests were ignored or refused by Defendant Edward Rice and without following any corporate formalities or maintaining any related books or records.

43.     Similarly, Defendant Edward Rice and his professional advisors also refused to generate an additional EIN for the HR Division to enable Herbert to file independent tax returns with the IRS, as contemplated by the NRI Shareholders Agreement.

44.     Herbert and Plaintiff repeatedly requested from Edward corporate books, records, tax returns and to hold corporate shareholder / director meeting, but such requests also were repeatedly rejected or ignored by the majority shareholder.

45.     In fact, Defendant Edward Rice admitted that there were no meetings held, and no records, record books, minutes or other documents relating to the business dealings and operation of Defendant NRI. (*See* HLR Decl. Action, ECF Doc. No. 95)

46.     Importantly there was neither a meeting appointing Defendant Edward Rice as

president of NRI nor a shareholder meeting since he purportedly became president of NRI. (*See* HLR Decl. Action, ECF Doc. No. 95)

### B. Herbert's Termination of NRI Shareholder Agreement and Transfer of HR Division's Assets

47.     The NRI Shareholder Agreement provides that it "***shall automatically terminate upon***," among other things, "A. The written request of a Shareholder to transfer the assets of his division … from the Corporation."  (Ex. A., Sec. 8.A.)

48.     After repeated efforts by Herbert to resolve the tax and corporate issues relating to NRI proved futile, including repeated requests to implement a tax-free reorganization, Herbert (a) effectively terminated the NRI Shareholder Agreement and (b) initiated transfer of the assets of the HR Division to Herbert, individually, by written notice dated June 24, 2018, to Edward R. Rice, at 2978 Beechwood Blvd, Pittsburgh, PA 15217, pursuant to Section 8A of the NRI Shareholder Agreement. A true and correct copy of Herbert's Termination Letter is attached hereto as **Exhibit B**.

49.     Thus, under the express provisions of Section 8.A of the NRI Shareholder Agreement, the Agreement "automatically" terminated and there were no further conditions.[3]

### C. Plaintiff's Undivided Fee Ownership Interest in the Real Property of HRA Partnership

50.     The business and affairs of Defendant HRA Partnership, and the relationship of its partners, are controlled and governed by a written General Partnership Agreement dated January 23, 1990, as amended by the Agreement dated April 30, 1997, Addendum dated February 26, 1998, and further Amendment dated April 29, 2004 (as amended, collectively, "HRA Partnership

---

[3] This is the subject of the HLR Declaratory Action and the extent of the overlap between the two actions.  The same is being restated only to provide background for the subsequent conduct of the named Defendants—which is substantially unrelated to the pending dispute about the validity and effect of Herbert's June 24, 2018 notice.

Agreement"), as more fully described below. A true and correct copy of the HRA Partnership Agreement is attached hereto as **Exhibit C**.

51.     The HRA Partnership Agreement provides that [Defendant] HRA Partnership "shall hold as *Trustee for NRI IN TRUST* an undivided 13.07% of the *fee title to said real estate*, and said interest of [NRI] shall be accounted for and treated as *an undivided ownership in fee of the property*.  (Ex. C, Sec. 4) (emphasis added).

52.     The NRI Shareholder Agreement incorrectly designated NRI's ownership interest in HRA Partnership's real property as "partnership interest," where instead NRI actually owns an *undivided 13.07% fee interest directly in the Subject Property*, which undivided fee interest is held and administered by the HRA Partnership "in trust". (Ex. B, Sec. 5; and Ex. C, Sec. 4.)

53.     The NRI Shareholder Agreement further provides that,

> The Shareholders agree to divide all other assets owned by [NRI] in accordance with the percentages set forth in the Preamble. Specifically, the Corporation will request that the *partnership interest* held in Hempstead Road Associates be split between the Shareholders, and that any distribution be sent to each Shareholder separately.

(Ex. C, Sec. 5.)

54.     On or about June of 2018, in accordance with Section 5 of the NRI Shareholder Agreement, Herbert provided a written demand to Defendant Walnut Capital Management instructing them to "retitle" Herbert's 5.99% undivided fee interest in the Subject Hempstead Property to **Herbert L. Rice and Suezette H. Rice, as Joint Tenants WROS (with right of survivorship)** from NRI.

55.     By written letter dated June 21, 2018, Michael A Goldstein, CPA, Chief Financial Officer of Defendant WCM, confirmed that Defendant WCM had "retitled" Herbert's 5.99% undivided fee interest in the Subject Hempstead Property from NRI to "**Herbert L. Rice and Suezette H. Rice, WROS (with right of survivorship)**". A true and correct copy of

correspondence from Defendant WCM attached hereto as **Exhibit D**. (emphasis original)

56.      Thereafter, for a period of two and one-half (2.5) years (10 quarters) the quarterly distribution checks and statements were made and issued to "Herbert L. Rice and Suezette H. Rice, WROS."

57.      NRI has also paid in capital and a Capital Account balance of at least $125,000. (Ex. C, Sec. 5.)

**D.  Defendants' Scheme to "Out" Plaintiff from the Hempstead Property**

58.      Around the period from August to September 2020, Defendants and other nonparty (and/or Doe) co-conspirators started devising and implementing a scheme to acquire Plaintiff's and her late father's 5.99% undivided fee ownership interest ("Plaintiff's Hempstead Interest")[4] in the Hempstead Property.

59.      Beginning in September of 2020, Defendants Reidbord and Perelman, initiated an effort to personally acquire Plaintiff's Hempstead Interest at a significantly depressed value and to "out" Plaintiff from NRI.

60.      Specifically, on September 14, 2020, in response to an inquiry from Plaintiff's lawyer, Beth Tarasi ("Beth") about the valuation of Plaintiff's interests in the Hempstead Property, Defendant Reidbord responded (with a copy to Defendants Perelman and Levine, and other employees of Defendant WCM) stating that Plaintiff's interests are worth Seventy-One Thousand Eight Hundred Ninety-Five and 46/100 Dollars ($71,895.46) without "applying any minority discount or costs of sale."  A true and correct copy of the parties' correspondence is attached hereto

---

[4] It should be noted that while the Hempstead Property was owned and titled in the HRA Partnership, a general partnership, and various general and managing partners of the HRA Partnership held approximately 86.93% ownership interest in the HRA Partnership, according to the governing General Partnership Agreement, Defendant NRI held its 13.07% undivided ownership interest ***directly*** in the Hempstead Property, which was held by the HRA Partnership, as trustee, "in trust" for the benefit of NRI. (*See generally* Ex. C)

as **Exhibit E**.

61.     Defendant Levine responded just to Defendant Reidbord that "we just want Suezette and Herb Rice **out** of NRI" and sought a fair market valuation for the HRA Partnership—that he would **not** provide to Plaintiff.  Specifically, Defendant Levine wrote:

> Do you have any fair market valuations/ net asset value as of at least first of the year? I don't want to create problems (as *we just want Suezette and Herb Rice out of NRI and this is the last piece*), however they may think the valuation is too low.  I assume they will ask for the same and I just wanted to see the latest financial and fair market valuation for [HRA Partnership]. *I won't provide this to [Plaintiff's lawyer] Beth and/or [Plaintiff's father] Herbert without your approval*.

(Ex. E) (emphasis added)

62.     Shortly thereafter, also on September 14, 2020, Defendant Levine wrote again to Defendant Reidbord that "EJ [Strassburger] just sent me the attached valuation report", based on which, Defendant Levine concluded that in 2019—even based on a valuation for an entirely different purpose (*i.e.*, for calculating estate and inheritance tax liability), intending to minimize fair market value as much as possible, and reflecting multiple redundant and exorbitant "layered" purported discounts cumulatively of 58%, for purported lack of both marketability and lack of control (i.e., 20%, plus 30%, plus 3%, plus 5%)—Plaintiff's Hempstead Interest would yield a fair market value of $119,825.76. (Ex. E)

63.     After reviewing the above, Defendant Reidbord instructed the HRA Partnership's accountant to "Make the deal for $100,000 … See what you can do 😉 Thanks."  (Ex. E)

64.     Appreciating the improper nature of said machinations in furtherance of scheme designed to materially depress the value of Plaintiff's Hempstead interest, in response to Defendant Reidbord's instruction, Defendant Levine sought to conceal his involvement in the scheme and conspiracy—all while making further suggestions regarding how best to couch their scheme:

> *I don't want this to look like it is going through us.*  Please email Beth and I directly that you've reconsidered some facts and you are willing to make the sale from NRI Happen quickly.  *Don't let them see our string of communications … please*.  To accomplish that

objective, you are increasing your offer to $100,000.  Let them know that this offer is over
33 times their average annual distributions they received over the last few years. Thanks.

(Ex. E) (emphasis added)

65.     Of course, it must be noted, that Defendant Reidbord and Defendant Levine, were
negotiating such a suppressed value to the Plaintiff's detriment not on behalf of the HRA
Partnership and the other Partners, but for the benefit of Defendants Reidbord and Perelman in
their ***individual*** capacities.

66.     Upon information and belief, Defendants NRI and Defendant Edward Rice knew
about, assisted Defendants Reidbord and Perelman, and actively participated in this scheme.

67.     Discussions and negotiations regarding purchase and sale of Plaintiff's Hempstead
Interest continued from September through December and in or about beginning of December,
2020, Defendants Reidbord and Perelman presented Plaintiff and her late father and, purportedly
Defendants Edward Rice and NRI, with proposed Sale and Purchase Agreements.

68.     On or about November 2, 2020, concurrently with the negotiations to acquire
Plaintiff's Hempstead Interest, Defendant Edward Rice through his counsel, provided written
notice to Defendant WCM and its Chief Financial Officer, to cease making quarterly distributions
to Plaintiff and Herbert and instead to divert and send all of those distributions to Defendant NRI.

69.     Said notice provided no basis or authority for such change, after two and half years
and ten previous quarterly payments.

70.     Although Defendant WCM and, its CFO Michael Goldstein previously
acknowledged and confirmed that Defendant WCM had both (A) retitled Plaintiff's Hempstead
Interest to **Herbert L. Rice and Suezette H. Rice, as Joint Tenants WROS (with right of
survivorship)** from NRI, and (B) for two and half years sent ten quarterly distribution payments
to Plaintiff and her late father, separately from NRI's, without any objection, curiously upon

14

receipt of this baseless unilateral demand, Defendant WCM and its CFO readily obliged and began diverting quarterly distributions and other payments from the third calendar quarter of 2020 to present, to Defendants NRI and Edward Rice, without any due diligence or opportunity for Plaintiff and/or Herbert to object and dispute such significant change, after two and half years.

71.     Following further discussions between Plaintiff and her late father with Defendants regarding potential sale and related matters, on December 14, 2020, Plaintiff's attorney sent a cease and desist demand to Defendants WCM, Reidbord, Levine and their legal counsel, Strassburger, informing them that Plaintiff and her late father have not reached any agreement with Defendant NRI and/or Edward Rice as to the sale or disposition of Plaintiff's Hempstead Interest and demanding that they "***cease and desist***, until the disposition of maters at-issue between NRI's former shareholders, any efforts to sell, transfer, or make any other disposition …" A true and correct copy of the December 2020 correspondence is attached hereto as **Exhibit F**.

72.     Upon information and belief, Defendants Reidbord, Perelman, Levine, and WCM, together with other nonparties (and/or Does 1-10), conspired to and/or took acts in furtherance of suppressing the profitability of the Hempstead Property, taking excessive compensation from the Hempstead Property, and/or otherwise wrongfully acted to reduce the periodic quarterly distributions payable to NRI (and through it Suezette Rice) on account of NRI's 13.07% undivided fee interest in the Hempstead Property in order to unduly depress the value of Plaintiff's Hempstead Interest and ultimately purchase said interest for a substantially reduced price, which was substantially lower the an the actual fair market value of said interest.

**E.  Failure to Disclose Concurrent $9,262,500 Mortgage Financing with Dollar Bank**

73.     Unbeknownst to Plaintiff and Herbert, concurrently with Defendants WCM, Reidbord and Perelman's negotiation to acquire Plaintiff's Hempstead Interest for $100,000 (or

less), they were also working on obtaining mortgage financing loan in the amount of $9,262,500 against the Hempstead Property from Dollar Bank, Federal Savings Bank ("Dollar Bank").

74.     On or about October 13, 2020, White Realty Advisors LLC was engaged to appraise the Hempstead Property in connection with such mortgage financing.

75.     On or about November 17, 2020, White Realty Advisors provided an appraisal valuing the Hempstead Property at $12,350,000 as of October 30, 2020, which---considering the purpose of the Market Value Opinion (i.e., to protect Dollar Bank, as potential lender), and the height of the COVID-19 pandemic at that time—upon information and belief, was conservative and on the low end of the market value range prevailing at that time.  A true and correct copy of the appraisal summary is attached hereto as **Exhibit G** (the entire appraisal was omitted for brevity, but a complete appraisal can be provided upon request).

76.     Even at such a conservative $12,350,000 valuation, Plaintiff's Hempstead Interest of 5.99% would be worth approximately ***$739,765***.

77.     Upon information and belief, however, it is believed by Plaintiff and, therefore, averred herein, that as of the date hereof, the actual market value of the Hempstead Property is actually more than 30% higher than the October 2020 appraisal referenced above and the Market Value is actually in the range of $18-20 million, making Plaintiff's Hempstead Interest more than 30% higher than the estimate referenced above.

78.     The morning after receiving Plaintiff's December 14th Cease and Desist correspondence, at 6:00AM on December 15, 2020, Defendant Reidbord emailed Defendant Levine, E.J. Strassburger, and Strassburger's office to inform them that a refinancing with Dollar Bank was pending and scheduled to close ***only two days later***, and demanded that they have "*Ed[ward Rice] sign the attached [resolution] and return it to us immediately.  All of the other*

16

*partners have signed.*" A true and correct copy of Defendants' December 15, 2020 correspondence is attached hereto as **Exhibit H**.

79.     From the face of his e-mail correspondence on the early morning of December 15, 2020, it is clear that Defendant Reidbord is acting in response to—and in clear disregard of—the demand to cease and desist from Plaintiff's counsel, in an attempt to force through the Dollar Bank financing without disclosing its existence and terms to Plaintiff or her late father.

80.     It is believed by Plaintiff and, therefore, averred herein, that the Dollar Bank financing was not disclosed and kept secret to intentionally in order to conceal the fact that such financing would have yielded—and did actually yield—a distribution payment of $107,405.82 to Plaintiff on account of Plaintiff's Hempstead Interest of 5.99%.

81.     Notably, such payment was Seven Thousand Four Hundred Five Dollars ($7,405) ***more*** than even the highest amount Defendants Reidbord and Perelman insisted on paying to Plaintiff as full consideration for Plaintiff's Hempstead Interest and the same was known to the Defendants when they were contemplating and making those offers to Plaintiff—in clear disregard of their duties to Plaintiff, as the managing partners of the trustee, and the inherent conflicted nature of their conduct (and concealment thereof).

82.     Upon information and belief, the requested resolution authorizing the Dollar Bank financing listed separately—and required the approvals and signatures from both—Plaintiff's late father, Herbert, for the HR Division, and from Defendant Edward Rice for the SR Division, all in accordance with the previous termination by Herbert of the NRI Shareholders Agreement on June 24, 2018, and acknowledgment of such termination and severance and retitling said interest by Defendant WCM, pursuant to its CFO's correspondence to Herbert dated June 21, 2018 among other correspondence and actions.

83.     However, while attempting to buy the interests, Defendants continued to withhold from Plaintiff and her late father the existence of and all information about the Dollar Bank financing and did not provide them or ask them to approve and sign the proposed resolution.

84.     Instead, on December 15, 2020, despite actual knowledge of Plaintiff's demand that Defendants cease and desist "any efforts to sell, transfer, or make any other disposition" of the Hempstead Property, during the course of the day Defendants conspired by e-mail and telephone with each other and other non-parties, including Defendant Edward Rice's counsel, E.J. Strassburger and Defendant Levine, to simply ignore the termination of the NRI Shareholder Agreement and the severance of NRI's SR and HR Divisions that occurred and was acknowledged by Defendant WCM in June 2018, by aggregating NRI's separate 5.99% for the HR Division and the other 7.685% for the SR Division, ***by crossing out and changing by hand*** Plaintiff's 5.993% to NRI's cumulative 13.675% and accepting Defendant Edward Rice's signature for both.  A true and correct copy of the resolution signature page is attached hereto as **Exhibit I**.

85.     On Tuesday, December 15, 2020, Defendant Reidbord responded by e-mail to NRI's counsel, E.J. Strassburger, stating "I spoke with Gregg [Defendant Perelman], we are OK with your suggestion. Thanks."

86.     Upon information and belief, the suggestion was to have Defendant Edward Rice sign the documents on behalf of Defendant NRI without disclosing any information whatsoever about the refinancing to Plaintiff.

87.     The Dollar Bank financing loan documents were signed on December 16, 2020 and closed on December 18, 2020, without Plaintiff's or her late father's knowledge.

88.     As Plaintiff would later learn, by chance, in January 2021, the one-time special distribution payable to Plaintiff and her late father on account of Plaintiff's Hempstead Interest as

a result of the Dollar Bank financing was $107,405.82, but instead was diverted to Defendant NRI, without Plaintiff's or her late father's knowledge or consent.

89.     Upon information and belief, Defendant Edward Rice's November 2020 demand to undo the NRI termination ***two and a half years earlier***, in June 2018, was intended to have this very effect—to conceal this distribution from Plaintiff altogether, in hopes to use it to acquire Plaintiff's Hempstead Interest and/or misappropriate the amount of such distribution payment from Plaintiff.

90.     The above one-time distribution, together with other quarterly distributions— current and future—commencing with the third quarter of 2020, collectively exceeding One Hundred Twenty-One Thousand Seven Hundred Eighty-Six Dollars ($121,786) as of the date hereof (collectively, "HR Unpaid Distributions") remain unpaid, and continue to accrue interest under applicable law.

### F. Defendant Edward Rice Did Not Execute a Joinder Agreement, Has Not Been Duly Appointed as President, and Had No Authority to Act Unilaterally for Defendant NRI or Bind NRI to any Agreements

91.     Upon information and belief, Sidney Rice was the President of Defendant NRI until his death on November 2, 2015.

92.     Following Sidney Rice's death, Plaintiff's late father, Herbert, was the only duly appointed living officer and director of Defendant NRI, as its sole living director and Vice President.

93.     Upon information and belief, no duly constituted meeting of the shareholders or directors was ever held in accordance with the Pennsylvania law.

94.     Upon Sidney Rice's death, the ownership of his shares in NRI passed to Sidney

David Rice Irrevocable Trust, of which Defendant Edward Rice is trustee.[5]

95.     Importantly, appointment as a director or officer of a Pennsylvania corporation, are not automatic or self-operative under the applicable Pennsylvania law and corporate formalities must be observed.

96.     Moreover, Section 14 of the NRI Shareholder Agreement, expressly provides that:

> No transfer by either Shareholder of shares of stock of the Corporation **(including transfers at death** and by operation of law) shall be effective unless the transferee has executed a joinder to this Agreement agreeing to be bound by its terms.

(Ex. A, Sec. 14) (emphasis added).

97.     Plaintiff and her late father, a significant shareholder of NRI, were never provided, or otherwise made aware of, any meeting, resolution, joinder, or other similar corporation action of NRI.

98.     On the contrary, it was admitted by Defendant Edward Rice's counsel—on January 6, 2022—that Defendant Edward Rice first signed a joinder to the NRI Shareholder Agreement, which was a condition to becoming NRI's shareholder—**on December 27, 2021**—approximately six (6) years after the passing of Sidney, and more than a year after signing the Dollar Bank financing resolution as the purported president of NRI. (*See* HLR Decl. Action, ECF Doc. No. 94)

99.     Therefore, any purported corporate action taken unilaterally by Defendant Edward Rice, during the period relevant hereto, was unauthorized, in direct contravention of NRI's Shareholder Agreement, *void ab initio*, and not binding on NRI or Plaintiff.

100.    Moreover, acting in their own self-interest and to conceal their unlawful conduct, the remaining Defendants (WCG, HRA, LPC, Reidbord, Perelman, and Levine) negligently, recklessly, and/or knowingly failed to perform a reasonable inquiry under the circumstances, failed

---

[5] Initially there was confusion about the actual ownership and control of the Trust, and it was only later determined that Defendant Edward Rice was the trustee and/or had any authority to act on behalf of the Trust.

to inquire about such authority from Plaintiff, failed review NRI's corporate records or perform rudimentary due diligence regarding the propriety of Defendant Edward Rice's instructions and actions, and/or failed to otherwise verify that Edward Rice had any such authority to act on NRI's behalf.

### G.  Plaintiff's Damages

101.    As a direct and proximate cause of the facts and averments set forth herein, Plaintiff was harmed.

102.    Plaintiff has been deprived of the distributions due to her, interest on such distributions, the benefit of the ability to operate her portion of NRI as a separate entity, has had her property encumbered without her knowledge or approval.

103.    Further, Plaintiff has been deprived of substantial tax benefits arising from Defendants' self-interested tax treatment and reporting.

104.    Further still, Plaintiff has had to expend tremendous resources to uncover the unauthorized, self-interested, and actively concealed unlawful conduct detailed herein.

105.    In fact, at all times material hereto, Defendants took overt actions specifically directed at preventing Plaintiff from obtaining information to which she was entitled as a shareholder of Defendant NRI, as an investor in HRA, and as a beneficiary of the services provided by Defendants WCM and Plung.

106.    Defendants' conduct as detailed herein is outrageous, extreme, self-interested, knowing, purposeful, willful, wanton and reckless, and justifies the imposition of punitive damages under applicable law.

107.    At a minimum, the costs, expenses, and attorneys' fees that Plaintiff has needlessly had to expend to uncover and obtain relief arising from Defendants' unlawful conduct should be

assessed as punitive damages against the Defendants.

108.    Plaintiff's damages as detailed herein continue to accrue.

109.    Further, Plaintiff's damages are easily quantifiable and clearly due to Plaintiff. Accordingly, this Court should award pre-judgment interest—together with applicable post-judgement interest on all such damages.

<div align="center">

**COUNT I**
**BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**
**(Plaintiff v. Defendants WCM, Todd Reidbord, Gregg Perelman, HRA, LPC, and Levine)**

</div>

110.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

111.    As more fully described above, Defendants Reidbord and Perelman are Managing Partners of the HRA Partnership and hold "IN TRUST" NRI's 13.07% "undivided fee" interest, and after it was transferred and retitled by Herbert's written notice in June 2018, Plaintiff's Hempstead Interest of 5.99%.  (Ex. A, Secs, 4-6)

112.    Unlike the Plaintiff and its predecessor in interest (Defendant NRI), other than Plaintiff's and NRI's undivided fee ownership interest, 86.93% of the HRA General Partnership's interests are held by various limited partners, together with Defendants Reidbord and Perelman as general partners directly in the HRA General Partnership.

113.    As Managing Partners of Trustee, each of them has a fiduciary obligation and duties of diligence and loyalty to Plaintiff, to disclose material facts, to treat partners fairly and equally in accordance with the applicable HRA Partnership Agreement, and to refrain from knowingly engaging in unlawful and/or self-interested conduct, both individually and on behalf of HRA Partnership.

114.    As described more fully above, Defendants Reidbord and Perelman materially

breached those duties in order to induce Plaintiff into selling her 5.99% undivided interest in the Hempstead Property to Defendants Perelman and Reidbord, ***individually***.

115.    Similarly, Defendant Levine—individually and as Director of tax at Defendant LPC—performed services for and on behalf of NRI, and through it Herbert and Plaintiff.

116.    By virtue of the same, both LPC and Levine owed Plaintiff fiduciary obligations and duties of diligence and loyalty to disclose material facts, to treat the shareholders of NRI fairly and equally in accordance with the applicable NRI Shareholders Agreement, and to refrain from knowingly engaging in unlawful and/or self-interested conduct, both individually and on behalf of Defendant LPC.

117.    In furtherance of the foregoing unlawful purpose and in self-interest, said Defendants used, and conspired to use, false pretenses, false representations, omitted material information, to deceive the Plaintiff about Defendants' intentions and value of Plaintiff's Hempstead interest, including, without limitation, by knowingly, willfully and maliciously:

      a.    conspiring to withhold from Plaintiff material information, including financial statements, net asset valuation and that the Hempstead Property actually appraised for at least $12,350,000, which would result in Plaintiff's undivided 5.99% ownership interest in the Subject Hempstead Rd Property being valued $739,765;

      b.    withholding, and conspiring to withhold from Plaintiff the information regarding pending financing with Dollar Bank for $9,262,500, which would result in a significant one-time distribution to Plaintiff of $107,405;

      c.    withholding, and conspiring to withhold from Plaintiff that the $100,000 proposed valuation was "too low"; and

      d.    Conspiring with Defendant Edward Rice to misappropriate and/or

improperly withhold from Plaintiff HR Unpaid Distributions, including a distribution resulting from Dollar Bank financing of $107,405;

      e.      Concealing said conduct and their involvement in the scheme.

118.     Said conduct was self-interested, not done in good faith, and not in furtherance of any legitimate business interest of Plaintiff and/or NRI.

119.     As a result of Defendants' breach of their fiduciary duties to Plaintiff, as trustee and otherwise, Plaintiff has sustained actual loss and injury and was and continues to be materially harmed.

120.     Such harm includes but is not limited to:

      a.      Deprivation of the value of Plaintiff's Hempstead Interest of approximately, $739,765, and interest thereon;

      b.      Dollar Bank's mortgage lien encumbering Plaintiff's fee ownership interest in the Hempstead Property;

      c.      Deprivation of HR Unpaid Distributions and other funds belonging to HR Division and Plaintiff—and/or disproportionate distributions from HRA Partnership—totaling in excess of $121,786;

      d.      Loss of revenue from or in relation to HR Divisions assets, resulting in a loss of divisions and other revenue and interest thereon; and

      e.      Additional tax liability that could have been lawfully avoided; and

      f.      Additional material fees and costs for tax and legal professionals, that would have been avoided had not for Defendants' unlawful conduct.

121.     Defendants' conduct was willful, knowing, intentionally, and/or reckless and was actively concealed by the Defendants from Plaintiff.

122.    Defendants' conduct was wanton, extreme, outrageous, and intolerable in a civilized community, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000, plus punitive damages, costs, interest, attorneys' fees, and such other relief as the Court deems equitable, just and proper.

<div align="center">

**COUNT II**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Plaintiff v.  Defendants Edward Rice, WCM, Reidbord, Perelman, LPC, and Levine)**

</div>

123.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

124.    The NRI Shareholder Agreement provided that each Shareholder (i.e., Herbert and Sidney) "shall be free to operate his division *without interference* or *oversight* from the other Shareholder, subject to the terms of [the NRI Shareholder Agreement]." (Ex. A, Sec. 1) (emphasis added)

125.    The NRI Shareholder Agreement further provides, without pre-conditions that,

> The Shareholders agree to divide all other assets owned by [NRI] in accordance with the percentages set forth in the Preamble. Specifically, the Corporation will request that the *partnership interest* held in Hempstead Road Associates be split between the Shareholders, and that any distribution be sent to each Shareholder separately.

(Ex. A, Sec. 5) (emphasis added)

126.    As described in detail above, Herbert properly terminated the Shareholders Agreement, separated NRI's undivided fee ownership interest in the Hempstead Property in June 2018. (Ex. B)

127.    Defendant WCM acknowledged in writing and implemented such directive from Plaintiff's late father and, indeed paid all distributions to Plaintiff and her late father, as Joint Tenants with right of survivorship for approximately two and half years.  (*See, e.g.*, Ex. D)

128.    Defendants Edward Rice, WCM, Reidbord, Perelman, LPC, and Levine were acutely aware of the way in which NRI's Shareholder Agreement was written, its intent, and the way in which NRI's ownership in the Hempstead Property was held and structured.

129.    Defendants Edward Rice, WCM, Reidbord, Perelman, LPC, and Levine tortiously interfered with Plaintiff's and her late father's contractual rights under the NRI Shareholder Agreement when—after two and half (2.5) years of Herbert's termination of the Shareholder Agreement and severance and transfer of HR Division's Hempstead Road Associates interest—(a) Defendant Edward Rice provided written instruction to disregard prior termination, severance and transfer of interest to Herbert and Plaintiff, and (b) Defendant WCM, upon information and belief, with the direction of Defendants Reidbord and Perelman, obliged such baseless and unilateral instruction, all in violation and breach of the express provisions of Section 1 and Section 5 of the NRI Shareholder Agreement.  (Ex. A, Secs 1, 5)

130.    Defendant Edward Rice's unilateral written instruction to divert and redirect distributions back to Defendant NRI provided no reasonable basis or authority and, after two and half years, would not have been accepted or followed by a reasonably prudent managing partner or asset manager.

131.    Defendants Edward Rice, WCM, Reidbord, Perelman, LPC, and Levine interfered with Plaintiff's contractual rights and provisions under the NRI Shareholder Agreement acting in self-interest and in order to misappropriate Plaintiff's distributions and otherwise deprive Plaintiff's profits and value associated with the Hempstead Property.

132.    Plaintiff has been damaged by Defendants' actions as detailed herein.

133.    Defendants' conduct was willful, knowing, intentionally, and/or reckless and was actively concealed by the Defendants from Plaintiff.

134.    Defendants' conduct in this regard was reckless, willful, knowing, extreme and outrageous and not tolerable in a civilized society, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000, plus punitive damages, costs, interest, attorneys' fees, and such other relief as the Court deems equitable, just and proper.

<div align="center">

**COUNT III**
**SHAREHOLDER OPPRESSION**
**(Plaintiff v. Defendant Edward Rice, individually and as Trustee of S.D.R. Trust)**

</div>

135.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

136.    Pennsylvania has a broad definition of oppressive conduct which expressly includes "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Gee v. Blue Stone Heights Hunting Club, Inc.*, 604 A.2d 1141, 1145 (Pa. Cmwlth.1992) (adopting rationale of New York state appellate courts); *see also Ford v. Ford*, 878 A.2d 894, 900 (Pa. Super. 2005) (adopting the "reasonable expectations" approach to determining oppressive conduct).

137.    A shareholder's reasonable expectations "may include things such as their employment in the corporation, a role in management, or a share of the profits of the enterprise." *Lustig v. Seffer*, No. 110 EDA 2013, 2013 WL 11250861, at *4 (Pa. Super. Ct. Nov. 6, 2013) *citing* e.g., *Viener v. Jacobs*, 834 A.2d 546, 557 (Pa. Super. 2003).

138.    As set forth more fully above, Defendant Edward Rice, both individually and as trustee of S.D.R. Trust engaged in pervasive and continued shareholder oppression by excluding Plaintiff and her late father, Herbert, from NRI's affairs and management, by withholding from distributions in the cumulative amount of at least $121,786 as of the date hereof (including

$107,405.82 from Dollar Bank financing, $1,198.26 for third quarter 2020, $1,797.74 for fourth quarter 2020, $1,198.24 for the first quarter of 2021) and all subsequent quarterly distributions on account of Plaintiff's Hempstead Interest; all material information, including tax returns, books, records and other documents and refusing to grant Plaintiff access to NRI's business and affairs.

139.    Defendant Edward Rice further engaged in shareholder oppression by disregarding and frustrating the shareholders' expectations, intentions, and agreements reflected in the NRI Shareholder Agreement, namely that "either Shareholder may at any time request that the assets … of his division be transferred to him or his nominee …", by causing a letter dated November 20, 2020, to be provided to Defendant WCM to undo the termination of the NRI Shareholders Agreement effectuated by Herbert in June 2018, in material contravention of the provisions of Sections 1 and 5 of the NRI Shareholder Agreement.

140.    Further, Defendant Edward Rice failed to treat the shareholders equally, diverted or took disproportionate distributions and failed to obtain Plaintiff's consent to engage in extraordinary corporate matters outside regular course of business—including, but not limited to, consenting to Dollar Bank refinancing without ever disclosing it to Plaintiff.

141.    NRI is a closely-held corporation that is illiquid and the minority ownership interest of its shares representing 45.86% of its capital stock, without control are extremely illiquid.

142.    As reflected in the NRI Shareholder's Agreement, Plaintiff and her late father, who is predecessor-in-interest to Plaintiff's ownership interest in NRI, reasonably expected to be free to operate the HR division without interference or oversight from the other Shareholder, to be able to transfer HR division to Plaintiff, upon request, to have the Hempstead Rd Property interest held and administered separately from NRI and Defendant Edward Rice and, of course, that any distributions be sent to them separately.

143.    Defendant Edward Rice's pervasive conduct repeatedly frustrated and impeded Plaintiff's and her late father's reasonable expectations as a minority shareholder of NRI, particularly, Defendant Edward Rice's baseless letter dated November 2, 2020, demanding that Plaintiff's distributions be diverted to NRI from Plaintiff.

144.    Defendant Edward Rice's conduct was reckless, willful, knowing, and/or intentional.

145.    Defendant Edward Rice's conduct was extreme, outrageous, and intolerable in a civilized community, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000.00, plus punitive damages, costs, interest, attorneys' fees and such other relief as the Court deems equitable, just and proper.

**COUNT IV**
**BREACH OF DUTY OF LOYALTY & FIDUCIARY DUTIES**
**(Plaintiff v. Defendant Edward Rice)**

146.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

147.    As more fully described above, Defendant Edward Rice purports to be, and at all relevant times held himself out as, majority shareholder and President NRI.

148.    As a majority shareholder and purported President of NRI, Defendant Edward Rice had a fiduciary obligation to keep books and records and adhere to other corporate formalities, to act in the best interest of NRI, to treat all shareholders fairly and equally, and to refrain from knowingly engaging in unlawful conduct on behalf of the NRI.

149.    Specifically, as majority shareholder and purported president of NRI, Defendant Edward Rice had a duty to adhere to the obligations, duties and other provisions set forth the NRI

29

Shareholder Agreement.

150.    Although some duties, rights and obligations of NRI's shareholders were addressed by the NRI Shareholder Agreement, NRI's affairs and its shareholders, directors and officers were subject to Pennsylvania's Business Corporation Law ("BCL"), 15 Pa.C.S. § 1101, et seq.

151.    By the conduct described herein---including, but not limited to, providing without reasonable basis or authority, written demand dated November 2, 2020 to Defendant WCM, diverting distributions payable to Plaintiff from HRA Partnership and seeking to disregard the other shareholder's termination of NRI Shareholder Agreement and transfer of assets in HRA Partnership—Defendant Edward Rice breached those fiduciary duties.

152.    In furtherance of the foregoing unlawful purpose and in self-interest, Defendant Edward Rice used, and conspired to use, false pretenses, false representations, omitted material information, to deceive the Plaintiff about his intentions and value of Plaintiff's Hempstead interest, including, without limitation, by knowingly, willfully and maliciously:

    a.    conspiring to withhold from Plaintiff material information, including financial statements, net asset valuation and that the Subject Hempstead Rd Property actually appraised for at least $12,350,000, which would result in Plaintiff's undivided 5.99% ownership interest in the Subject Hempstead Rd Property being valued $739,765;

    b.    withholding, and conspiring to withhold from Plaintiff the information regarding pending financing with Dollar Bank for $9,262,500, which would result in a significant one-time distribution to Plaintiff of $107,405;

    c.    Conspiring with Defendants Reidbord and Perelman to misappropriate and/ or improperly withhold from Plaintiff HR Unpaid Distributions totaling in excess of $121,786;

      d.      Modifying and signing the resolution approving the Dollar Bank financing without Plaintiff's knowledge or consent, and without the consent of Plaintiff's father Herbert, who was alive when the resolution was signed.

153.    Defendant Edward Rice's conduct was self-interested, not done in good faith, and not in furtherance of any legitimate business interest of NRI.

154.    As a result of Defendant's breach of fiduciary duties to Plaintiff, as trustee and otherwise, Plaintiff has sustained actual loss and injury and was and continues to be materially harmed as detailed herein.

155.    Such harm includes but is not limited to:

      a.      Dollar Bank's mortgage lien encumbering its undivided fee ownership interest in the Hempstead Property;

      b.      Deprivation of HR Unpaid Distributions and other funds belonging to HR Division and Plaintiff—and/or disproportionate distributions from HRA Partnership—totaling in excess of $121,786, together with any and all future distributions;

      c.      Loss of revenue from or in relation to HR Divisions assets, resulting in a loss of divisions and other revenue and interest thereon; and

      d.      Additional tax liability that could have been lawfully avoided;

      e.      Additional material fees and costs for tax and legal professionals, that would have been avoided had not for Defendants' unlawful conduct;

      f.      Frustration of Plaintiff's reasonable expectations in the Company.

156.    Defendant's conduct was willful, knowing, intentionally, and/or reckless and was actively concealed by the Defendants from Plaintiff.

157.    Defendant's conduct in this regard was reckless, willful, knowing, extreme and

outrageous and not tolerable in a civilized society, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000.00, plus punitive damages, costs, interest, attorneys' fees and such other relief as the Court deems equitable, just and proper.

## COUNT V
## NEGLIGENT MISREPRESENTION
**(Plaintiff v. Defendants Reidbord, Perelman, WCM, LPC, and Levine)**

158.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

159.    Section 552 of the Restatement of Torts applies to "factual scenarios where a party is providing professional information that is designed to be relied upon by a third party." *Fulton Bank, N.A. v. Sandquist*, No. 2306 EDA 2016, 2017 WL 4284923, at *8 (Pa. Super. Ct. Sept. 27, 2017) (citing *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 481, 866 A.2d 270, 287 (2005) (finding liability under Section 552 of the Restatement of Torts "where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.")).

160.    For example, Section 552 of the Restatement of Torts has been interpreted by Pennsylvania's courts to apply to attorneys and accountants that are in the "business of supplying information". *See generally Fulton Bank, N.A. v. Sandquist*, No. 2306 EDA 2016, 2017 WL 4284923 (Pa. Super. Ct. Sept. 27, 2017); *see also Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Executives*, No. CV 18-633, 2021 WL 1313108, at *10 (E.D. Pa. Apr. 8, 2021).

161.    Here, Defendants Reidbord, Perelman and WCM, are in the business of managing

the Hempstead Property for Plaintiff's benefit and, in furtherance thereof, were in the business of supplying management, accounting and business information.

162.    Similarly, Defendants LPC and Levine, are in the business of providing accounting services for NRI for Plaintiff's benefit and, in furtherance thereof, were in the business of supplying management, accounting and business information.

163.    At the time said Defendants were negotiating the purchase of Plaintiff's Hempstead Interest for $100,000, or less, said Defendants had actual knowledge of the each of the following matters:

      a.    pending financing with Dollar Bank, in the amount of $9,262,500 which would likely result in a distribution of approximately $107,000 on account of Plaintiff's Hempstead Rd Interest,

      b.    then current appraisal of the Hempstead Rd Property, as of October 30, 2020, by White Realty Advisors valuing the Hempstead Rd Property at $12,350,000;

      c.    Herbert's termination of the NRI Shareholder Agreement and transfer of the Hempstead Interest to Herbert L. Rice and Plaintiff, as Joint Tenants WROS.

164.    Plaintiff reasonably believed that the Defendants were acting as a neutral party in offering to negotiate buy out of Plaintiff's Hempstead Interest with SR Division and HR Division of NRI.

165.    Further, upon information and belief, the accountants and other employees of Defendants WCM and LPC have various accounting, reporting and other duties to disclose relevant material facts pertaining to the transaction they are overseeing to all parties.

166.    However, as described above, said Defendants failed to disclose the above pending financing, fair market valuation and other matters and facts, and which were material to the

purchase price determination of Plaintiff's Hempstead Interest and where or not to enter into the purchase and sale with Defendants Reidbord and Perelman or pursue another course of action.

167.    Said Defendants, and non-party employees and agents of Defendant WCM and LPC, at a minimum negligently, supplied and omitted such material information to Plaintiff.

168.    The Defendants' failure to disclose the same resulted in the harm detailed herein.

169.    Plaintiff reasonably relied on the Defendants and their employees' and agents' neutrality, the information that was provided, and the notion that facts that would be material to Plaintiff relating to Plaintiff's Hempstead Interest were not omitted and/or withheld by Defendants from Plaintiff.

170.    Plaintiff's reliance was foreseeable and consistent with contractual relationship under the HRA Partnership Agreement, the NRI Shareholders Agreement, and the parties' long-standing business dealings.

171.    Further, upon information and belief, the Defendants continued to work with Defendants Edward Rice and NRI, provided them funds that they were diverting from Plaintiff.

172.    At a minimum, such conduct was negligent.  However, upon information and belief, the Defendants acted recklessly, knowingly, purposefully, and with complete disregard for Plaintiff and/or their professional duties.

WHEREFORE, Plaintiff demands judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000.00, plus punitive damages, costs, interest, attorneys' fees and such other relief as the Court deems equitable, just and proper.

**COUNT VI**
**CONVERSION**
**(Plaintiff v. Defendant Edward Rice and NRI)**

173.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended

Complaint as if set forth fully herein.

174.    As described above, Defendants retained and failed to distribute proceeds of the Dollar Bank refinancing for their personal gain and without privilege, justification, permission, accounting to or reimbursement of Plaintiff.

175.    By failing and refusing to account for or return and reimburse such funds, Defendants wrongfully exerted dominion over the property of Plaintiff in violation of Plaintiff's rights and applicable law.

176.    Plaintiff demanded a return of the same, but the Defendants refused.

177.    Further, Plaintiff demanded an accounting of the amounts held, but even that was refused.

178.    As a direct and proximate result of the aforementioned conduct, Plaintiff has been harmed.

179.    Defendants' conduct was reckless, willful, knowing, and/or intentional.

180.    Defendants' conduct was extreme, outrageous, and intolerable in a civilized community, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demand judgment in their favor and against the Defendants, jointly and severally, in the amount in excess of $75,000.00, plus punitive damages, costs, interest, attorneys' fees and such other relief as the Court deems equitable, just and proper.

<div align="center">

**COUNT VII**
**CIVIL CONSPIRACY**
**(Plaintiff v. All Defendants)**

</div>

181.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

182.    As set forth above, Defendants agreed to act together to deprive Plaintiff of the HR

Unpaid Dividends, substantial portion of Plaintiff's Hempstead Interest and to encumber Plaintiff's Hempstead Interest.

183. As set forth above, Defendants agreed to act together to unlawfully deprive Plaintiff of the substantial rights and value arising out of and relating to Plaintiff's Hempstead Interest.

184. Defendants used unlawful means and engaged in multiple acts intended to conceal their conduct from Plaintiff.

185. Defendants acted for the unlawful purpose of retaining and converting Plaintiff's funds that did not belong to them.

186. Defendants performed overt acts in pursuance of this scheme as set forth more fully herein, as evidenced by the exhibits attached hereto, and as will presented at trial.

187. In furtherance of their unlawful conspiracy as more fully set forth above, *inter alia*, the Defendants used, and conspired to use, false pretenses, false representations, omitted material information, to deceive the Plaintiff about Defendants' intentions and value of Plaintiff's Hempstead interest, including, without limitation, by knowingly, willfully and maliciously

    a. conspiring to withhold from Plaintiff material information, including financial statements, net asset valuation and that the Subject Hempstead Rd Property actually appraised, in connection with Dollar Bank financing, for at least $12,350,000, which would result in Plaintiff's undivided 5.99% ownership interest in the Subject Hempstead Rd Property representing $739,765;

    b. withholding, and conspiring to withhold from Plaintiff the information regarding pending financing with Dollar Bank for $9,262,500, which would result in a significant one-time distribution to Plaintiff of $107,405;

    c. withholding, and conspiring to withhold from Plaintiff that the $100,000

proposed valuation was "too low"; and

       d.    Conspiring with Defendant Edward Rice to misappropriate and/or improperly withhold from Plaintiff HR Unpaid Distributions, totaling in excess of $121,786, as well as all future distributions.

188.    Plaintiff has been harmed by Defendants' conduct as detailed herein.

189.    Defendants' conduct was willful, knowing, intentionally, and/or reckless and was actively concealed by the Defendants from Plaintiff.

190.    Defendants' conduct in this regard was reckless, willful, knowing, extreme and outrageous and not tolerable in a civilized society, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff demand judgment in her favor and against the Defendants, jointly and severally, in the amount in excess of $75,000.00, plus punitive damages, costs, interest, attorneys' fees and such other relief as the Court deems equitable, just and proper.

## COUNT VIII
## ACCOUNTING / INSPECTION OF CORPORATE RECORDS
### (Plaintiff v.  Defendant NRI)

191.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

192.    Similarly, the Pennsylvania BCL provides shareholders with access to information upon reasonable notice. *See generally* 15 Pa. C.S. § 1508.

193.    Plaintiff has made numerous requests for information from Defendants Edward Rice, NRI, WCM, and HRA.  However, such requests were ignored and/or Defendant Edward Rice (and/or his representatives) expressly instructed the recipients not to cooperate with Plaintiff. By way of limited example only, see December 20, 2019 correspondence from the Strassburger

law firm attached hereto as **Exhibit J**.[6]

194.    Further, as detailed herein, NRI has received distributions but has withheld the existence and amounts of such distributions as well as the expenses incurred by NRI from Plaintiff.

195.    Upon information and belief, Defendant Edward Rice together with NRI's service providers knowingly, purposefully and actively concealed material information about NRI from Plaintiff.

196.    Pursuant to the BCL, Plaintiff is entitled to inspect and review financials, books and records of NRI, together with its representatives' communications relating to NRI's dealings.

WHEREFORE, Plaintiff respectfully request that this Court order an equitable accounting of NRI's financials, income and expense history, meeting minutes / resolutions, communications relating to and/or referencing NRI's business dealings, and other corporate documents beginning on June 1, 2018 and continuing through the present date.

## COUNT IX
## ACCOUNTING / INSPECTION OF PARTNERSHIP RECORDS
### (Plaintiff v.  Defendants HRA, WCM, Reidbord, and Perelman)

197.    Plaintiff incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

198.    The Pennsylvania BCL provides limited partners with access to information upon reasonable notice. *See generally* 15 Pa. C.S. § 8634.

199.    As set forth above, Plaintiff has made numerous requests for information from Defendants Edward Rice, NRI, WCM, and HRA.  However, such requests were ignored and/or Defendant Edward Rice (and/or his representatives) expressly instructed the recipients not to cooperate with Plaintiff.  (Ex. J)

---

[6] Notably, Plaintiff was not copied on such correspondence and only became aware of the same until such correspondence was produced in discovery.

200.    Upon information and belief, Defendants Edward Rice, Reidbord and Perlman knowingly, purposefully and actively concealed material information about their dealings relating to NRI, HRA, and WCM from Plaintiff.

201.    Pursuant to Section 6 of the HRA Partnership Agreement, and as further described above, at all times material hereto, Plaintiff was and remains entitled to 5.99% of the "net profits" of the HRA Partnership.  (Ex. C, Sec. 6)

202.    Upon information and belief, Defendants Reidbord, Perelman and WCM, together with other nonparties (and/or Does 1-10), conspired to and/or took acts in furtherance of suppressing the profitability of the Hempstead Property, taking excessive compensation from the Hempstead Property, and/or otherwise wrongfully acted to reduce the periodic quarterly distributions payable to NRI (and through it Suezette Rice) on account of NRI's 13.07% undivided fee interest in the Hempstead Property in order to unduly depress the value of Plaintiff's Hempstead Interest and ultimately purchase said interest for a substantially reduced price, which was substantially lower the actual fair market value of said interest.

203.    As General Partners of HRA Partnership, trustee of Plaintiff's Hempstead Interest, Defendants Reidbord and Perelman had a fiduciary duty to act in the best interests of and for the benefit of Plaintiff, and not in self-interest.

204.    It is believed by Plaintiff and, therefore, averred herein, that at all material times hereto, Defendants WCM, Reidbord and Perelman have benefited from the ill-gotten gains derived from their excessive and improper fees, charges and other amounts from the HRA General Partnership's revenue, which resulted in Plaintiff receiving substantially lower distributions.

205.    Further, upon information and belief, and based on Defendant Reidbord's December 15, 2020 6:00AM email notifying Defendant Edward Rice—purportedly for the first

time—about the forthcoming refinancing, *which was set to close two days later*, Defendants Reidbord, Perelman and WCM, together with other nonparties (and/or Does 1-10) the and/or selectively communicated and disclosed information to partners of HRA. (Ex. H)

206.    Plaintiff is entitled to inspection of the corporate records and communications relating to the HRA Partnership, WCM, Reidbord, Perelman and/or the partners payments and distributions therefrom, and operation thereof.

207.    Plaintiff has legitimate concerns, based on the conduct described above, that the Company's assets and monies are being mismanaged and/or misappropriated by Defendants WCM, Perelman and Reidbord, including for the purpose of suppressing HRA Partnership's profits in order to buy out Plaintiff's Hempstead Interest for an unduly suppressed and low value.

208.    Further, Plaintiff has legitimate concerns, based on the conduct described above, that the HRA Partnership has operated to the benefit of certain partners and at the expense of other partners.

209.    Plaintiff seeks equitable and reasonable accounting of all fees, charges, expenses and other amounts and payments received by Defendants WCM, Reidbord, Perelman and their other affiliates in order to properly ascertain all funds wrongfully diverted from Plaintiff and its predecessor in interest NRI.

210.    Plaintiff also seeks the disclosure of WCM, Reidbord, and Perelman's communications with the other partners of the HRA Partnership as well as with third-parties relating to the 2020 Dollar Bank refinancing.

WHEREFORE, Plaintiff respectfully request that this Court order an equitable accounting of the HRA Partnership financials, income and expense history, meeting minutes / resolutions, communications relating to and/or referencing the 2020 Dollar Bank refinancing, and other

partnership documents beginning on June 1, 2018 and continuing through the present date.

Respectfully submitted,

Dated: April 28, 2023

By: _____
Anton Kaminsky, Esquire
KAMINSKY LAW, LLC
PA Atty. ID No. 322660
207 Buck Road, Suite 2
Southampton, PA 18966
Tel. (215) 876-0800
kaminsky.esq@gmail.com
*Attorney for Plaintiff*

## **VERIFICATION**

Under penalties of perjury, I, Suezette H. Rice, declare that I have read the foregoing Amended Complaint, and the facts alleged therein are true and correct, to the best of my knowledge and belief.

Dated:  4-28-23

SUEZETTE H. RICE

# EXHIBIT "A"

## SHAREHOLDER AGREEMENT

THIS AGREEMENT made as of this 7 ᵗʰ day of March, 2014, by and among NATHAN RICE, INC., a Pennsylvania corporation, (hereinafter "Corporation") located in Pittsburgh, Pennsylvania and HERBERT L. RICE ("HR") and SIDNEY RICE ("SR") (collectively HR and SR are the "Shareholders" or "Shareholder"):

WHEREAS, HR is the owner of 45.86% of the issued and outstanding common stock of the Corporation, and SR is the owner of 54.14% of the issued and outstanding common stock of the Corporation.

WHEREAS, the Corporation is in the process of selling its major asset (the "Relinquished Property"); and

WHEREAS, the Shareholders desire to set forth their understanding regarding the use of the proceeds from the sale of the asset, and the operation of the Corporation after the sale.

NOW, THEREFORE, in consideration of the mutual covenants of the Corporation and of the Shareholders, the parties hereby agree as follows:

1.    **OPERATION OF THE CORPORATION.** The Shareholders agree that they will create two (2) divisions, the HR Division and the SR Division within the Corporation. Each Shareholder shall be free to operate his division without interference or oversight from the other Shareholder, subject to the terms of this Agreement. Each Shareholder shall be solely responsible for any expenses or liability incurred in the operation of his division, and shall be solely entitled to retain any income or profit from the operation of his division, without respect to the percentage ownership of the Corporation. Neither Shareholder shall have any obligation to contribute capital to the Corporation, but may voluntarily contribute capital to his division as he, in his sole discretion, deems necessary. Either Shareholder may at any time request that the assets (subject to the liabilities) of his division be transferred to him or his nominee, provided that such Shareholder shall be solely responsible for, and shall indemnify the other Shareholder for, any taxes payable with respect to the transfer.

2.    **1031 EXCHANGE.** The Shareholders agree to defer the tax on the sale of the Relinquished Property pursuant to Section 1031 of the Internal Revenue Code, and the Shareholders agree not to take any action that would disqualify the sale for tax deferral under Section 1031. The parties agree that Old Republic Exchange Facilitator Company ("OREXCO") shall be the qualified intermediary and shall receive the net proceeds of the sale of the Relinquished Property (the "Proceeds").

3.    **REPLACEMENT PROPERTY.** The Shareholders agree that each will identify without interference from the other Shareholder a "Replacement Property" (as defined in the Internal Revenue Code), and will work exclusively with OREXCO to conclude the acquisition of the Replacement Property. The Shareholders understand that each must identify his

Page 1

Replacement Property within forty-five (45) days of the sale of the Relinquished Property and that the Corporation must close on the purchase of the Replacement Property within One Hundred Eighty (180) days of the sale of the Relinquished Property.

      A.    Available Proceeds. The Shareholders agree that the share of Proceeds available to each Shareholder for the purchase of his respective division's Replacement Property shall be in the same percentages of the total Proceeds as their shareholdings in the Corporation (i.e. 45.84% to HR and 54.16% to SR). If a Shareholder selects a Replacement Property that has a greater purchase price than the 1031 Proceeds available to that Shareholder, then the Shareholder shall pay the balance of the purchase price from his own funds. Likewise, if a Shareholder selects a Replacement Property whose purchase price is less than the 1031 Proceeds available to that Shareholder, then the Shareholder shall be responsible for recognizing the gain on that portion of the unused Proceeds, and paying the tax thereon.

      B.    Closing on the Replacement Property. Title to the Replacement Properties shall be held in the name of the Corporation, but shall be identified on the books of the Corporation as assets of the HR division and the SR division, respectively.

      C.    Pledging Replacement Property. Neither Shareholder will mortgage his division's Replacement Property unless such financing is without recourse to the assets of the other division.

    4.    **BOOKS AND RECORDS**. Each Shareholder shall maintain his own books and records, and shall account for all income and expenses separately from the other. Each Shareholder shall provide income and expense information at least annually to Howard Plung, CPA for preparation of a tax return or returns (as he shall determine), and shall pay such tax on his taxable income without contribution from the other Shareholder. Neither Shareholder shall have the right to view or inspect the books or records of the other Shareholder, and each Shareholder waives any such right as may exist at law to receive annual financial statements of the Corporation.

    5.    **DIVISION OF OTHER ASSETS**. The Shareholders agree to divide all other assets owned by the Corporation in accordance with the percentages set forth in the Preambles. Specifically, the Corporation will request that the partnership interest held in Hempstead Road Associates be split between the Shareholders, and that any distribution be sent to each Shareholder separately. Likewise, the Corporation will divide any remaining cash held by the Corporation in accordance with the percentages set forth in the Preambles.

    6.    **COOPERATION OF SHAREHOLDERS.** The Shareholders agree to cooperate to sign such resolutions, and take such action as is necessary to effectuate the terms of this Agreement, including signing such bank resolutions as may be necessary for each of HR and SR to maintain bank accounts or to borrow for his respective division without the participation of the other Shareholder.

7.     **INDEMNIFICATION.** Each Shareholder agrees to indemnify and hold the other harmless from any expense or liability arising out of the operation of his separate division.

8.     **TERMINATION.** This Agreement shall automatically terminate upon the happening of any of the following events:

A.     The written request of a Shareholder to transfer the assets of his division (subject to the liabilities of his division) from the Corporation.

B.     The written consent of the Shareholders; or

C.     The restructuring of the Corporation in a tax free reorganization.

9.     **AGREEMENT BY THE CORPORATION.** The Corporation agrees, for and on behalf of itself and its successors and assigns, to the terms of this Agreement.

10.    **SPECIFIC PERFORMANCE.** The parties declare that it is impossible to measure in money the damage which will accrue to a party hereto by reason of a failure to perform any of the obligations under this Agreement. Further, in recognition of the irreparable harm that a violation of any of the covenants of this Agreement would cause the Corporation, the Shareholders agree that in addition to any other relief afforded by law, a temporary and permanent injunction against any and all violations may be immediately issued against them and every other person concerned thereby; it being their understanding that both damages and an injunction shall be proper relief and are not to be considered alternative remedies. Therefore, if any party hereto or the successor, assign or personal representative of a deceased Shareholder shall institute any action or proceeding to enforce the provisions hereof, any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such successor, assign or personal representative has or have an adequate remedy at law, and such person shall not assert in any such action or proceeding the claim or defense that such remedy at law exists.

11.    **TITLES OF SECTIONS.** The titles of the sections through out this Agreement are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretations, construction or meaning of the provisions of this instrument.

12.    **GENDER AND NUMBER.** As used in this Agreement, any gender shall include any other gender, the plural shall include the singular, and the singular shall include the plural.

13.    **COUNTERPARTS.** This Agreement shall be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

14.    **SUCCESSORS.** The terms of this Agreement shall be binding upon, inure to the benefit of and shall be enforceable by the parties hereto, their heirs, legatees, personal

representatives, successors or permitted assigns. No transfer by either Shareholder of shares of stock of the Corporation (including transfers at death and by operation of law) shall be effective unless the transferee has executed a joinder to this Agreement agreeing to be bound by its terms.

15.   **AMENDMENT.** This Agreement constitutes the entire understanding and agreement among the parties and may not be amended, modified, or revoked in whole or in part except by a subsequent written agreement executed by all shareholders of the Corporation, or their successors, assigns or personal representatives, as the case may be, and the Corporation, its successors and permitted assigns.

16.   **LAW.** This Agreement has been executed in the Commonwealth of Pennsylvania, shall be construed in accordance with the laws of said Commonwealth, and shall be enforced only in the state and federal courts of said Commonwealth.

17.   **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, and when executed shall constitute one agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed this ____GR____ day of March, 2014.

ATTEST:                                              NATHAN RICE, INC.

By: _____                                _____
    Secretary                                        President

WITNESS:

_____                                    _____
                                                    Herbert L. Rice

_____                                    _____
                                                    Sidney Rice

Page 4

representatives, successors or permitted assigns. No transfer by either Shareholder of shares of stock of the Corporation (including transfers at death and by operation of law) shall be effective unless the transferee has executed a joinder to this Agreement agreeing to be bound by its terms.

15.     **AMENDMENT.** This Agreement constitutes the entire understanding and agreement among the parties and may not be amended, modified, or revoked in whole or in part except by a subsequent written agreement executed by all shareholders of the Corporation, or their successors, assigns or personal representatives, as the case may be, and the Corporation, its successors and permitted assigns.

16.     **LAW.** This Agreement has been executed in the Commonwealth of Pennsylvania, shall be construed in accordance with the laws of said Commonwealth, and shall be enforced only in the state and federal courts of said Commonwealth.

17.     **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, and when executed shall constitute one agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed this _____ day of March, 2014.

ATTEST:                                    NATHAN RICE, INC.

By: _____              _____
    Secretary  Attorney                   President

WITNESS:

_____                  _____
                                          Herbert L. Rice

_____                  _____
                                          Sidney Rice

# EXHIBIT "B"

Herbert L. Rice, 7509 Rigby Court, Lakewood Ranch, Florida 34202

Edward R Rice

297B Beechwood Blvd

Pittsburgh, Pa 15217-3162

June 24, 2018

Attention: Edward Rice

I, Herbert L. Rice, is terminating the Nathan Rice, Inc. shareholder agreement dated March 9, 2014 and have assets of my division transferred to me in accordance with section 8A of the shareholder agreement.

Sincerely,

Herbert L Rice

# EXHIBIT "C"

1861329.v2

## AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT OF
## HEMPSTEAD ROAD ASSOCIATES

This Amendment to General Partnership Agreement of Hempstead Road Associates is dated as of ⟶June 10⟵, 2013 (this "Amendment"), by all of the partners of Hempstead Road Associates, a Pennsylvania general partnership (the "Partnership");

WHEREAS, the Partnership was organized pursuant to a General Partnership Agreement dated as of January 23, 1990, as amended (the "Partnership Agreement");

WHEREAS, in connection with the refinancing of the Partnership's existing credit facility, the partners desire to enter into this Amendment to incorporate the single purpose entity provisions required by the Lender (as defined herein);

NOW, THEREFORE, in consideration of the covenants here and after set forth, the partners hereto agree that, notwithstanding any other provisions of the Partnership Agreement to the contrary, the Partnership Agreement is hereby amended as follows:

1.____ Purpose. The Partnership's business and purpose shall consist solely of the acquisition, ownership, operation and management of the real estate project known as Hempstead Road Apartments located in the City of Pittsburgh, Allegheny County, Pennsylvania (the "Property") and such activities as are necessary, incidental or appropriate in connection therewith.

2.____ Powers and Duties. Notwithstanding any other provisions of the Partnership Agreement (as amended hereby) and so long as any obligations secured by the Security Instrument (as defined below) remain outstanding and not discharged in full, without the consent of all Partners, the Managing Partner (as defined in the Partnership Agreement) shall not have any authority to:

(a)     cause the Partnership to engage in any business or activity other than those set forth in Article 1 hereto;

(b)     borrow money or incur indebtedness on behalf of the Partnership other than normal trade accounts payable and lease obligations in the normal course of business (or such other Permitted Debt (as defined in the Loan Agreement as hereinafter defined), or grant consensual liens on the Partnership's property, except that the Managing Partner is hereby authorized to obtain financing for the Partnership (the "Loan") as originally evidenced by a Promissory Note entered by the Partnership and made payable to GS Commercial Real Estate LP, a Delaware limited partnership (together with its successors and assigns, "Lender") and a Loan Agreement entered by the Partnership and Lender (as amended, the "Loan Agreement") and secured by the lien on the Property evidenced by a Mortgage, Assignment of Leases and Rents, Collateral Assignment of Property Agreements, Security Agreement and Fixture Filing filed in the official public records of Allegheny

1861329.v2

County, Pennsylvania for the benefit of Lender (the "Security Instrument"), and to obtain such other indebtedness expressly permitted therein or in the Loan Agreement;

(c)     dissolve, wind-up or liquidate the Partnership;

(d)     sell or lease, or otherwise dispose of, all or substantially all of the assets of the Partnership;

(e)     file a voluntary petition or otherwise initiate proceedings to have the Partnership adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Partnership, or file a petition seeking or consenting to reorganization or relief of the Partnership as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Partnership; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Partnership or of all or any substantial part of the properties and assets of the Partnership, or make any general assignment for the benefit of creditors of the Partnership, or admit in writing the inability of the Partnership to pay its debts generally as they become due or declare or effect a moratorium on the Partnership debt or take any action in furtherance of any such action;

(f)     amend, modify or alter Articles 1 through 7 of this Amendment to the Partnership Agreement as set forth herein; or

(g)     cause the Partnership to merge, combine or consolidate with any other entity.

Notwithstanding the foregoing and so long as any obligation secured by the Security Instrument remains outstanding and not discharged in full, no Partner, including the Managing Partner, shall have any authority to take any action in items (a) through (d), (f) or (g) without (1) the prior written consent of the holder of the Security Instrument and (2) after any Securitization (as defined in the Loan Agreement) and if requested by the holder of the Security Instrument, confirmation from each of the Rating Agencies (as defined in the Loan Agreement) that such action will not result in the qualification, withdrawal or downgrade of any securities rating assigned in connection with the Loan.

3.___ Title to Partnership Property. All property owned by the Partnership shall be owned by the Partnership as an entity and, insofar as permitted by applicable law, no Partner shall have any ownership interest in any Partnership property in its individual name or right, and each Partner's Partnership Interest shall be personal property for all purposes.

4.___ Separateness/Operations Matters. Except as otherwise permitted by the Loan Agreement and/or any modifications, substitutions or replacements thereof, the Partnership shall:

(a)     maintain books and records and bank accounts separate from those of any other person;

E. Rice 816

1861329.v2

     (b)   maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets;

     (c)   hold regular meetings, as appropriate, to conduct the business of the Partnership, and observe all customary organizational and operational formalities;

     (d)   hold itself out to creditors and the public as a legal entity separate and distinct from any other entity;

     (e)   prepare separate tax returns and financial statements, or if part of a consolidated group, then it will be shown as a separate member of such group;

     (f)   allocate and charge fairly and reasonably any common employee or overhead shared with affiliates;

     (g)   transact all business with affiliates on an arm's-length basis and pursuant to enforceable agreements;

     (h)   conduct business in its own name, and use separate stationery, invoices and checks;

     (i)   not commingle its assets or funds with those of any other person;

     (j)   not assume, guarantee or pay the debts or obligations of any other person.

     (k)   pay its own liabilities out of its own funds;

     (l)   pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations;

     (m)   not hold out its credit as being available to satisfy the obligations of others;

     (n)   not acquire obligations or securities of its partners, members or shareholders;

     (o)   not pledge its assets for the benefit of any other entity or make any loans or advances to any entity;

     (p)   correct any known misunderstanding regarding its separate identity; and

     (q)   intend to remain solvent and maintain adequate capital in light of its contemplated business operations.

5.___ **Effect of Bankruptcy, Death or Incompetency of a Partner.** The bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Partner shall not cause the termination or dissolution of the Partnership and the business of the Partnership shall continue. Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Partner (an "assignee") shall have all the rights of such Partner

E. Rice 817

1861329.v2

for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Partner. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Partnership Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Partner.

6.____ **Subordination of Indemnities**.   All indemnification obligations of the Partnership are fully subordinated to any obligations respecting the Property and such indemnification obligations shall in no event constitute a claim against the Partnership if cash flow in excess of amounts necessary to pay obligations under the Loan is insufficient to pay such indemnification obligations.

7.____ **Third Party Beneficiary**. Lender is intended to be a third-party beneficiary of Articles 1 through 6 of this Amendment to the Partnership Agreement as set forth herein.

8.____ **Amendment to Section 12 of the Partnership Agreement**. Section 12 of the Partnership Agreement is hereby amended and restated in its entirety as follows:

"Amendments to this Agreement shall become effective only if in writing, signed by all the Partners."

Sections 6 and 7 of this Amendment are only intended to survive until the Obligations (as defined in the Security Instrument) are paid in full.

To the extent of any conflict between the provisions of the Partnership Agreement and this Amendment, the provisions of this Amendment shall control.

This Amendment shall not be effective until after the close of the Defeasance (as defined in that certain Defeasance Pledge and Security Agreement, dated as of June ___, 2013, by and among the Partnership and Wells Fargo Bank, N.A., as Trustee for the Registered Holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2004-C3) as related to the Property.

E. Rice 818

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____
Todd E. Reidbord

_____
Gregg M. Perelman

_____
Brad Perelman

_____
Sally P. Lehman

_____
Howard Plung

_____
Harvey E. Robins

_____
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By: _____
Name: Richard A. Weisman

By: _____
Name: Evelyn Talbott

E. Rice 819

## SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

Todd E. Reidbord

Gregg M. Perelman

Brad Perelman

Sally P. Lehman

Howard Plung

Harvey E. Robins

Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By·_____
Name: Richard A. Weisman

By:_____
Name: Evelyn Talbott

E. Rice 820

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____

Todd E. Reidbord

_____

Gregg M. Perelman

_____

Brad Perelman

_____

Sally P. Lehman

*Howard Plung*
Howard Plung

_____

Harvey E. Robins

_____

Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By: _____
Name: Richard A. Weisman

By: _____
Name: Evelyn Talbott

E. Rice 821

JUN-06-2013  12:53       BRENNAN ROBINS & DALEY              412 281 2180    P.001

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____
Todd E. Reidbord

_____
Gregg M. Perelman

_____
Brad Perelman

_____
Sally P. Lehman

_____
Howard Plung

_____
Harvey L. Robins

_____
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By: _____
Name: Richard A. Weisman

By: _____
Name: Evelyn Talbott

E. Rice 822

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____
Todd E. Reidbord

_____
Gregg M. Perelman

_____
Brad Perelman

_____
Sally P. Lehman

_____
Howard Plung

_____
Harvey E. Robins

_____  6/4/13
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By:_____
Name: Richard A. Weisman

By:_____
Name: Evelyn Talbott

E. Rice 823

<u>SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT</u>

_____
Todd E. Reidbord

_____
Gregg M. Perelman

_____
Brad Perelman

_____
Sally P. Lehman

_____
Howard Plung

_____
Harvey E. Robins

_____
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By:_____
Name: Richard A. Weisman

By:_____
Name: Evelyn Talbott

E. Rice 824

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____
Todd E. Reidbord


_____
Gregg M. Perelman


_____
Brad Perelman


_____
Sally P. Lehman


_____
Howard Plung


_____
Harvey E. Robins


_____
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By: _Richard A. Weisman_____
Name: Richard A. Weisman


By: _____
Name: Evelyn Talbott

SIGNATURE PAGE TO AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT

_____
Todd E. Reidbord

_____
Gregg M. Perelman

_____
Brad Perelman

_____
Sally P. Lehman

_____
Howard Plung

_____
Harvey E. Robins

_____
Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By:_____
Name: Judith A. Kasdan

By: _____
Name: Richard A. Weisman

By: _Evelyn Talbott_
Name: Evelyn Talbott

ROSALYN  SILVERMAN  REVOCABLE
TRUST

By: *Rosalyn Silverman Revocable Trust*
Name:
Title:

ESTATE OF DONALD PLUNG

By:_____
Name:
Title:

    As a 13.075% owner in the property in which the Company holds as trustee for the said
Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent
to the above resolutions and agrees to be bound thereby.

NATHAN RICE, INC.

By:_____
Name:
Title:

E. Rice 827

ROSALYN SILVERMAN REVOCABLE
TRUST

By:_____
Name:
Title:

ESTATE OF DONALD PLUNG

By:_____
Name: Louis B Plunc
Title: Executor

    As a 13.075% owner in the property in which the Company holds as trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above resolutions and agrees to be bound thereby.

NATHAN RICE, INC.

By:_____
Name:
Title:

ROSALYN SILVERMAN REVOCABLE
TRUST

By:_____
Name:
Title:

ESTATE OF DONALD PLUNG

By:_____
Name:
Title:

As a 13.075% owner in the property in which the Company holds as trustee for the said
Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent
to the above resolutions and agrees to be bound thereby.

NATHAN RICE, INC.

By: _Edward Rice_
Name: _for Nathan Rice Inc._
Title:

E. Rice 829

11-19??  15·24      ???????S ????IED                412 521 12??  P.02

## GENERAL PARTNERSHIP AGREEMENT

THIS AGREEMENT OF GENERAL PARTNERSHIP entered into on January 23, 1990, by and among CHARLES D. GROSS and MADELEINE S. GROSS, his wife; DONALD PLUNG, HOWARD PLUNG, ALEXANDER SILVERMAN and ROSALYN SILVERMAN, his wife, KASDAN, WEISMAN & TALBOTT ASSOCIATES, RICHARD KELLY, and HARVEY E. ROBINS, GREGG PERELMAN, (hereinafter collectively referred to as "Partners" and individually as "Partner").

1. Name and Purpose. The Partnership shall be carried on under the name of Hempstead Road Associates, a Pennsylvania General Partnership. The Partnership has been formed for the purpose of owning, developing, operating, leasing and otherwise dealing with apartment house real estate, situate in the City of Pittsburgh, Allegheny County, Pennsylvania, the original purchase of said real estate having eight (8) apartment buildings.

2. Place of Business. The principal office of the Partnership shall be located at 2715 Murray Avenue, Pittsburgh, Pennsylvania 15217, or at such other location as a majority in interest of the Partners shall from time to time agree.

3. Term. The Partnership shall commence as of the date hereof and shall continue until terminated as hereinafter provided.

4. Partners. The names and addresses of each of the Partners are as follows:

-1-

E. Rice 830

| Charles D. Gross | Madeleine S. Gross |
|---|---|
| 2715 Murray Avenue | 2715 Murray Avenue |
| Pittsburgh,  PA  15217 | Pittsburgh,  PA  15217 |

Donald Plung
Suite 1600
900 Law & Finance Building
Pittsburgh,  PA  15219

Howard Plung
Suite 1600
900 Law & Finance Building
Pittsburgh,  PA  15219

Kasdan, Weisman & Talbott,
 Associates
3500 Fifth Avenue
Suite 200
Pittsburgh,  PA  15213

Alexander Silverman and
Rosalyn Silverman, his wife
3708 Fifth Avenue
Medical Arts Bldg., Suite 5?
Pittsburgh,  PA  15213

Harvey E. Robins
Suite 500, Ft. Pitt Commons
445 Fort Pitt Blvd.
Pittsburgh,  PA  15219

Richard Kelly
900 Law & Finance Building
Pittsburgh,  PA  15219

Gregg Perelman
600 Penn Center Blvd.
Suite 500
Pittsburgh,  PA  15235

In addition, the Partnership shall hold as Trustee for Nathan Rice, Inc. IN TRUST an undivided __13.07__ percent of the fee title to said real estate, and said interest of said Nathan Rice, Inc., (hereinafter referred to as "Rice"), shall be accounted for and treated as an undivided ownership in fee of the property.  The Partnership Agreement as to Rice shall be considered as contract obligations between Rice and the other Partners and said Rice's interest shall be subordinate to any and all mortgages, liens, or liabilities in the ownership of the real estate, and Rice's interest shall be liable for its proportionate share of the payments thereon and the debts and expenses incurred in the operation and management thereof.

5. Capital Contributions.  Each of the Partners has contributed

-2-

E. Rice 831

to  the capital of the Partnership, in cash, the amount set forth
opposite his name, other than as set forth hereinbelow:

| Partner | Contribution | |
|---------|-------------|---|
| Charles D. Gross | 100,000.00 | |
| Madeleine S. Gross | 100,000.00 | |
| Donald Plung | 62,500.00 | |
| Howard Plung | 62,500.00 | |
| Alexander Silverman and Rosalyn Silverman, his wife | 50,810.00  50,810.00 | 12.22 |
| Kasdan, Weisman & Talbott | 169,357.00 | 20.37 |
| Richard Kelly | 33,855.00 | 4.07 |
| Harvey E. Robins | 100,000.00 | 12.03 |
| Gregg Perelman | 101,620.00 | 12.22% |
| | $831,452.00 | |

An individual capital account shall be established and
maintained for each Partner, who shall receive an interest in the
Partnership and shall be credited with the amounts of his capital
contributions to the Partnership from time to time.  A Partner
shall not be entitled to interest on his capital contribution, or
to withdraw any part of his capital account, or to receive any
distribution from the Partnership, except as specifically provided
herein.

The Partners acknowledge that Charles and Madeleine
Gross shall be given a credit of $25,000.00 each or a total cre-
dit for capital contribution of $50,000.00 as their fee for ser-

-3-

E. Rice 832

vices rendered in the obtaining of the real estate and the real
estate financing and that such fee is reflected in the Capital
Contributions set forth hereinabove.

Nathan Rice, Inc. shall contribute to the purchase of
the real estate the sum of $125,000.00.

6. <u>Net Profits, Net Losses and Cash Flow</u>. (a) <u>Profits and losses</u>
subject to such adjustments as may be required pursuant to
Paragraph 7, below, the net profits and the net losses shall be
shared by the Partners as follows:

| Partners | Percentage |
|---|---|
| Charles D. Gross | 10.45% |
| Madeleine S. Gross | 10.45% |
| Donald Plung | 6.535% |
| Howard Plung | 6.535% |
| Alexander Silverman and Rosalyn Silverman, his wife | 5.31% 5.31% |
| Kasdan, Weisman & Talbott | 17.72% |
| Richard Kelly | 3.54% |
| Harvey E. Robins | 10.46% |
| Gregg Perelman | 10.62% |
|  | 86.93% |

The net profits and net losses of the entire project
shall be divided as follows:

The Partnership - Hempstead Road Associates        86.93

-4-

E. Rice 833

Nathan Rice, Inc.                                    13.07

                                                    100.00%

       The terms "net profits" and "net losses" shall mean the
net profits and losses of the Partnership as determined for federal
income tax purposes by the certified public accountant servicing
the Partnership account.

       (b)  Cash flow.  The "cash flow of the Partnership" shall
be the net profits and losses of the Partnership as defined in
paragraph 6(a) above, plus (i) depreciation and other noncash
charges deducted in determining such net profits and losses, (ii)
the net proceeds from any refinancing of the Partnership's mortga-
ges, and (iii) the net proceeds from the sale of any of the
Partnership's assets, minus (i) principal payments on all mortga-
ges, (ii) any other cash expenditures which have not been deducted
in determining the net profits and losses of the Partnership, and
(iii) any amount reasonably required to maintain sufficient working
capital and a reasonable reserve for replacements.  The cash flow
of the Partnership shall be determined separately for each fiscal
year and not cumulatively and, as so determined, shall be distri-
buted in the same proportion as profits and losses are shared in
accordance with paragraph 6(a), subject to such adjustments as may
be required by paragraph 7.  The cash flow shall be distributed by
the Managing Partner as the Partners owning a majority in interest
shall agree.

       (c)  Income accounts.  A separate income account shall

E. Rice 834

Partner.  If a Partner has no credit balance in his income
account, losses shall be charged to his capital account.

7.  Additional Funds and Adjustments.  (a)  Call for funds.  The
Partners recognize that the income produced by the Partnership's
properties may be insufficient to pay the operating costs of the
properties.  If, in the judgment of the Managing Partner, addi-
tional funds are required to pay such operating costs, the addi-
tional funds shall be called for by the Managing Partner and shall
be contributed by the Partners in proportion to their capital
interests in the Partnership.  However, the amount of funds subject
to call and contribution in any calendar year shall not exceed
$50,000 in the aggregate, unless any excess is approved by Partners
holding at least a 70 percent interest in the capital of the
Partnership.  As used above, the term "operating costs" shall
include, without limitation: principal and interest payments on
partnership loans, whether or not secured by mortgages on
Partnership properties; costs of repair, maintenance, and improve-
ments; insurance premiums; and real estate taxes, assessments, and
other governmental charges.

(b)  Contributions for nondefaulting partners.  If any
Partner is unable or unwilling to make any or all of his propor-
tionate additional capital contribution, then the remaining
Partners who are able and willing to do so may make a contribution
in excess of their proportionate share, in such amounts as they may
agree among themselves.  If they are unable to agree, each Partner

-6-

E. Rice 835

who is able and willing to make a contribution shall have the pri-
mary right to contribute that portion of such excess which the pro
portion of such Partner's capital interest in the Partnership bear
to the aggregate capital interest of all contributing Partners, and
a secondary right to contribute any remaining portion of such
excess which is not desired to be contributed by any other contri-
bution Partner in the exercise of his primary right.  If more than
one Partner desires to exercise secondary rights, all such partners
shall be entitled to contribute the remaining portion of such
excess in the same proportion as stated above with regard to their
primary rights.

        (c)  Contributions by nondefaulting partners.  Any Partner
who makes a contribution to the Partnership pursuant to paragraph
7(b) above shall have the option to (1) treat the contribution as
additional capital of the Partnership, or (2) treat the contribu-
tion as a loan to the defaulting Partner, which election shall be
made, in writing, at the time the contribution is made.

        (1)  If the contributing Partner elects to treat his
contribution as additional capital, such funds shall be allocated
to his capital account.  After such contributions are made, each
Partner's percentage interest in the profits, losses and cash flow
of the Partnership shall be adjusted and determined by dividing the
aggregate cash contributions of all the Partners to the Partnership
since the inception of the Partnership, into the aggregate cash
contributions of each Partner.  The resulting quotient with respect
to each Partner shall be the adjusted percentage interest of such

-7-

E. Rice 836

to each Partner shall be the adjusted percentage interest of such
Partner.  Such adjusted percentage interest of each Partner shall
supersede the percentage interest of such Partner as set forth in
paragraphs 6(a) and 6(b) above.

        (2)  If the contributing Partner elects to treat his
contribution as a loan to the defaulting Partner, then no adjust-
ment shall be made to the contributing Partner's capital account,
and his share in the profits, losses, and cash flow of the
Partnership shall remain the same.  However, the capital account of
the defaulting Partner shall be increased by the amount of the
loan, and a defaulting Partner's share in the profits, losses, and
cash flow of the Partnership shall be adjusted as if he had made a
contribution to the capital of the Partnership in the amount of the
loan.  The amount advanced by the Partner on behalf of the
defaulting Partner shall be a debt of the defaulting Partner to the
contributing Partner and shall bear interest at the rate of 9 per-
cent per annum, or the maximum rate permitted by law, whichever is
lesser.  Thereafter, all distributions of cash from the Partnership
due to the defaulting Partner shall be paid to the Partner (or pro
rata to each Partner) who elected to treat a contribution as a
loan, until such time as the principal and interest of the loan(s)
are paid in full.

    8.  Managing Partner.  (a)  The day-to-day affairs of the Partnership
shall be handled by the Managing Partners, Charles and Madeleine
Gross, or either one of them.  Should both Managing Partners be una
or unwilling to serve, or cease to act as Managing Partners, a suc-

-8-

E. Rice 837

Partner of the Partnership, as well as the successor to fill any vacancy thereafter occurring in such office, shall be the individual appointed by Partners owning a majority in interest of the capital of the Partnership.

(b)  The Managing Partner shall be removed by any Partner upon a finding that the Managing Partner has perpetrated a fraud or other criminal act against the Partnership and in addition thereto, the Managing Partner may be removed upon a vote of two-thirds vote of the interest of the capital of the Partnership to remove the acting Managing Partner at a Partnership meeting.  In such event, the successor Managing Partner shall be the person named or appointed, as the case may be, pursuant to the provision of this section.

(c)  The Managing Partner shall provide such services to the operation of the Partnership business as he shall deem proper and necessary, including keeping all Partners informed of all letters, accounts, writings and other information which shall come to his attention concerning the business of the Partnership.

(d)  The Managing Partner shall keep or cause to be kept full records of each transaction of the Partnership and shall maintain such records at the principal office of the Partnership or at the principal office of the Partnership's accounting firm.  Said records shall be open for inspection and examination by all Partners, or their duly authorized representative, at all reasonable times.  The Managing Partner shall furnish, or cause to be furnished, to each Partner statements of financial condition of the

-9-

E. Rice 838

Partnership within 60 days after the end of each fiscal year of th
Partnership.  The fiscal year of the Partnership shall end on
December 31.  In addition, the Managing Partner shall provide
monthly statements on the operation of the Partnership to the
Partners which shall include bank balances and occupancy of the
apartments or properties.

(e)  The Managing Partner shall cause the funds of the
Partnership to be deposited in such bank account(s) as he shall
designate and withdrawals shall be made upon the signature of the
Managing Partner, or in his absence, upon such signatures as the
Partners shall authorize.

(f)  The Managing Partner shall have authority to make
individual expenditures and contracts for the Partnership and pro-
perty, not exceeding $10,000.00 per item.  Any expenditure in
excess of said sum shall require the approval of the majority of
the Partnership.

(g)  The Managing Partner shall not be liable to the
Partnership or to any Partner for any mistake or error in judgment
or for any act or omission believed in good faith to be within the
scope of authority conferred by this Agreement.  The Managing
Partner shall be liable only for acts and/or omissions involving
intentional wrongdoing.

(h)  No compensation shall be paid to the Managing
Partners for their services, unless they act as the rental agent of
the real estate owned by the Partnership.  Apartments Unlimited, a
company owned by Charles and Madeleine Gross, shall enter into a

-10-

E. Rice 839

contract to manage the building, the terms of said Management
Agreement is attached hereto and made a part hereof.

9.  Voting.   Each Partner shall vote in proportion to his capital
interest in the Partnership from time to time.  Each Partner may
exercise his vote by written or oral notification to the Managing
Partner, in each of those instances hereinafter stated.

10.  Consent to Operations.  The procedure for the operation of the
Partnership shall be as follows:

     (a)  The day-to-day affairs of the Partnership shall be
handled by the Managing Partner, as hereinabove stated.

     (b)  The following actions shall require the vote and una-
nimous approval of all the Partners.

          (1)  The purchasing and developing of new properties;

          (2)  The amendment of this Partnership Agreement, and

          (3)  The admission of new partners to the Partnership

          (4)  Borrowing money in the partnership's name, other
than in the ordinary course of the partnership's business or to
finance any part of the purchase price of the partnership's proper-
ties.

          (5)  Transferring, hypothecating, compromising or
releasing any partnership claim except on payment in full.

          (6)  Purchasing any partnership property or entering
into any contract for any such purpose, other than in the ordinary
course of the partnership's business of operating those properties
or businesses which have been previously purchased and other than

-11-

E. Rice 840

any hypothecation of partnership property to secure a debt resulting from any transaction permitted under (4) above.

(c)  All other actions taken by the Partnership, excluding those mentioned in subparagraphs (a) and (b) above, shall require the vote and approval of Partners owning a majority in interest of the capital of the Partnership.

(d)  Notwithstanding anything herein to the contrary, the Managing Partner shall attend the closing on the purchase of the Hempstead Apartments and make, execute and deliver on behalf of the partnership any and all mortgages, notes, agreements and other documents necessary and/or convenient to the purchase thereof, including without limitation a mortgage and note to Goldome Realty Credit Corporation and the Federal National Mortgage Association, and such other documents as they may deem appropriate.

11.  New Partners.  Except as provided in paragraph 13, new partners may be admitted into the Partnership, after the required vote, only if they agree to execute and acknowledge such instruments as are necessary or desirable to effect such admission and to confirm their agreement to be bound by all the covenants, terms and conditions of this Agreement, as the same may have been amended.  Each new partner shall receive a capital interest and share in the profits, losses, and cash flow of the Partnership in an amount to be determined by all other Partners at the time of admission.

12.  Amendments.  Amendments to this Agreement shall become effective only if in writing, signed by all the Partners, and filed with

E. Rice 841

the County Records of Allegheny County, Pennsylvania.

13.   Transfer of Partnership Interest.   (a)  Permitted transfers
during life.  During the life of a Partner, he may transfer all or
any part of his Partnership interest by gift, sale or other
transfer, either in trust or outright, to or for the benefit of his
spouse and/or any of his descendants, including his stepchildren and
any descendant whose relationship to the Partner is created by birth
or adoption.  Thereafter, the transferee shall become a Partner with
all the interests, rights and duties previously held by the
transferor.

          Unless expressly consented to in writing by the nontrans-
ferring Partners, no transfer of a Partnership interest shall in any
way alter or diminish the transferor's obligation with respect to
any then unpaid additional contributions required to be made pur-
suant to paragraph 7 above.

          (b)  Prohibited transfers during life.  During the life of
a Partner, he shall not pledge, cause a lien to be placed against
or encumber his Partnership interest in any way.  Except as other-
wise provided in paragraph 13(a) above, a partner shall not sell or
in any other way transfer his Partnership interest during his life-
time without first offering such interest for sale to the
Partnership in a writing addressed and delivered to the principal
office of the Partnership.  The notice shall set forth the proposed
sale price and terms of sale.  Thereupon, the Partnership shall
have a period of thirty (30) days to notify the selling Partner of

-13-

E. Rice 842

NOV-11-1996  15:38        APARTMENTS UNLIMITED              412 521 1277   P.15

its intention to purchase the interest offered for sale pursuant to
the terms of that offer.  If the Partnership timely elects to
purchase the selling Partner's interest (which election shall be
made on behalf of the Partnership by a majority in interest of
Partners other than the selling Partner), then within 45 days after
receipt by the Partnership of such offer to sell, the Partnership
shall purchase said interest at the price and upon the terms at
which said interest is offered for sale.  If the interest is not
purchased by the Partnership within said 45-day period, then during
the six-month period thereafter the offering Partner may sell his
Partnership interest so offered for sale to any person whomsoever;
provided, however, that said interest shall not be sold at a lower
price or on more favorable terms than the price and terms set forth
in the notice sent by the Partner in accordance with this paragraph
13(b) without first reoffering said interest for purchase by the
Partnership in accordance with this paragraph 13(b).  If the
offering Partner does not sell his Partnership interest within the
six-month period, he shall thereafter not sell or in any other way
transfer such interest without first reoffering such interest for
sale to the Partnership, in the manner set forth in this paragraph
13(b).

        Unless expressly consented to in writing by the nontrans-
ferring Partners, no transfer of a Partnership interest shall in any
way alter or diminish the transferor's obligations with respect to
any then unpaid additional contributions required to be made pur-
suant to paragraph 7 above.

                            -14-

E. Rice 843

(c)  At Death of Partner.  **Estate becomes a Partner**. After the death of a Partner, the decedent's estate, by its fiduciary (and the beneficiary and/or beneficiaries of the Partnership interest from the estate), shall become partners with all the interests, rights and duties previously held by the decedent (except the right to be Managing Partner).

(d)  **Waiver of Right to Bring Partition Action**.  Each partner, for himself, his heirs, fiduciaries, successors and assigns, expressly waives any right he may have to initiate and/or prosecute a partition action relating to this partnership and any interest he may have in its assets, and such partner's rights shall be limited to the transfer provisions contained in Paragraph 13 of this agreement.

14.  **Termination of the Partnership**.  The Partnership shall be terminated and dissolved upon the vote of a majority in interest of th Partners.  Upon the termination of the Partnership as herein provided, a full and general accounting shall be taken of the Partnership business and the affairs of the Partnership shall be wound up.  Any profits or losses incurred since the previous accounting shall be divided among the Partners and shall be added to the distribution to be made to the Partners.  The Managing Partner shall wind up and liquidate the Partnership by selling the Partnership assets and, after the payment of the Partnership liabilities, expenses and fees incurred in connection with such liquidation, by distributing the net proceeds therefrom in cash to the

-15-

E. Rice 844

Partners in proportion to their capital interest in the Partnershi!

Except as otherwise expressly provided in this Partnership Agreement, dissolution of the Partnership shall be subject to the provisions of the Pennsylvania Uniform Partnership Act, as now constituted or hereafter amended or substituted. Unless otherwise required by law or by court order and subject to the provisions of paragraph 14 of this Partnership Agreement, the Partnership business shall not terminate upon the occurrence of any event causing dissolution of the Partnership. Any successor by the operation of law t a surviving Partner's interest, including, by way of example and no by way of limitation, a guardian, a receiver, or a trustee in bankruptcy, shall be deemed an assignee having the rights which an assignee of such Partner's interest would have under the provisions hereinabove set forth.

15. _Notices_.  All notices, consents and other instruments hereunder shall be in writing and mailed by certified mail, return receipt requested, postage prepaid, and shall be directed to the parties hereto at the addresses hereinabove set forth or at the last addresses of the parties furnished by them in writing to the Managing Partner.  Notices to the personal representative of a deceased Partner's estate shall be mailed in the same manner to the last known address of such representative.

16. _Binding Effect_.   This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective

-16-

E. Rice 845

next-of-kin, legatees, administrators, executors, legal represen-
tatives, successors and permitted assigns.

17.  Indemnification.   Each partner shall indemnify and hold
harmless the partnership and each of the other partners from any
and all expense and liability resulting from or arising out of any
negligence or misconduct on his part to the extent that the amount
exceeds the applicable insurance carried by the partnership.

18.  Integration.  This Agreement represents the entire Agreement
among the partners.  Amendments to this Agreement shall not be
binding unless reduced to writing and executed by all of the
Partners hereto or their respective heirs, fiduciaries, successors
and assigns.

19.  Counterparts.  This Agreement may be executed in two or more
counterparts, each of which shall be deemed an original.

        IN WITNESS whereof the parties hereto, with intent to be
legally bound hereby, have placed their hands and seals on the day
and year first above written.

| _____ | _____ |
| Witness | Charles D. Gross |
| _____ | _____ |
| Witness | Madeleine S. Gross |
| _____ | _____ |
| Witness | Donald Plung |

-17-

NOV-11-1996  15:32      APARTMENTS ULIMITED                      412 521 1277   P.19

_____          _____
Witness                            Howard Plung

_____          _____
Witness                            Alexander Silverman

_____          _____
Witness                            Rosalyn Silverman

_____          _____
Witness                            Richard Kelly

_____          _____
Witness                            Harvey E. Robins

_____          _____
Witness                            Gregg Perelman

                                   KASDAN, WEISMAN & TALBOTT

_____          By: _____
Witness                                Richard B. Kasdan, M.D.

_____          By: _____
Witness                                Richard A. Weisman, M.D.

_____          By: _____
Witness                                John B. Talbott, M.D.

                                   NATHAN RICE, INC.

_____          By: _____
Witness

                                -18-

                                                        TOTAL P.19

E. Rice 847

AMENDMENT TO GENERAL PARTNERSHIP AGREEMENT
HEMPSTEAD ROAD ASSOCIATES

This Amendment to the Agreement of General Partnership executed this 30th day of April, 1997 by and among CHARLES D. GROSS and MADELINE S. GROSS, his wife, DONALD PLUNG, HOWARD PLUNG, ALEXANDER SILVERMAN, ROSALYN SILVERMAN, HIS WIFE, KASDAN, WEISMAN & TALBOTT ASSOCIATES, RICHARD KELL, HARVEY E. ROBINS and GREGG PERELMAN, herein collectively referred to as the "Partners" and individually as "Partner", and NATHAN RICE, INC.

W I T N E S S E T H :

WHEREAS, on the 23rd day of January, 1990 a General Partnership Agreement was executed by the Partners creating Hempstead Road Associates, a Pennsylvania General Partnership; and

WHEREAS, the Partners and NATHAN RICE, INC. have agreed to Amend the purpose of said Partnership as herein set forth;

NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration passing among the Parties hereto, the Parties agree to the following Amendment to the General Partnership Agreement as follows:

1.     Name and Purpose: Paragraph 1 is amended to provide as follows: The Partnership shall be carried on under the name of Hempstead Road Associates, a Pennsylvania General Partnership. The nature of the business and the purposes to be conducted by the Partnership is to engage solely in the following activities:

(a)  To own, develop, operate, lease and otherwise deal with eight (8) apartment buildings acquired by the Partnership by Deed dated January 23, 1990 from the Estate of Charles M. Morris which is recorded in the Recorder's Office of Allegheny County in Deed Book Volume 8189, Page 188 (the "Property").
(b)    To exercise all powers enumerated in the Partnership Act of Pennsylvania necessary or convenient to the conduction, promotion or attainment of the business or purposes otherwise set forth herein.

E. Rice 848

2. Certain Prohibited Activities: The Partnership shall only incur indebtedness in an amount necessary to operate and maintain the property. For so long as any mortgage lien in favor of First National Bank of North Carolina, or its successors or assigns (the "First Mortgage") exists on any portion of the Property, the Partnership shall not incur, assume or guaranty any other indebtedness, without the consent of First Mortgage holder. For so long as the First Mortgage exists on any portion of the Property, the Partnership shall not dissolve or liquidate, or consolidate or merge with or into any other entity, or convey or transfer its properties and assets substantially as an entirety or transfer any of its Partnership interests to any entity. For so long as the First Mortgage exists on any portion of the Property, the Partnership will not voluntarily commence a case with respect to itself, or petition, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the Partners of the Partnership. For so long as the First Mortgage exists on any portion of the Property, no material amendment to this Partnership Agreement may be made without first obtaining approval of the mortgagee holding the First Mortgage on any portion of the property. Upon satisfaction of the First Mortgage, the Partnership shall be free to amend the Partnership Agreement and to borrow funds by encumbering the Property upon consent of the Partners

3. Indemnification: The indemnification of any of the Partners of the Partnership shall be fully subordinated to any obligations respecting the Property (including, without limitation, the First Mortgage) and such indemnification shall not constitute a claim against the Partnership in the event that the cash flow is excess of amounts necessary to pay the holders of such obligations is insufficient to pay such obligations.

4. Separateness Covenants: For so long as the First Mortgage exists on any portion of the Property, in order to preserve and ensure the Partnership's separate and distinct identity, in addition to the other provisions set forth in this Partnership Agreement, the Partnership shall conduct its affairs in accordance with the following provisions:

(a) It shall establish and maintain an office through which its business shall be conducted separate and apart from that of any of its Partners or affiliates and shall allocate fairly and reasonably any overhead for shared office space.

(b) It shall maintain Partnership records and books of account separate from those of any affiliate.

(c) It shall observe all Partnership formalities

(d) It shall not commingle assets with those of any affiliate

(e)  It shall conduct its own business in its own name.

(f)  It shall maintain financial statements separate from any affiliate.

(g)  It shall pay any liabilities out of its own funds including salaries of any employees, not funds from any affiliate.

(h)  It shall maintain an arm's length relationship with any affiliate.

(i)  It shall not guarantee or become obligated for the debts of any other entity, including any affiliate, or hold out its credit as being able to satisfy the obligations of others.

(j)  It shall use stationary, invoices and checks separate from any affiliate.

(k)  It shall not pledge its assets for the benefit of any other entity, including any affiliate.

(l)  It shall hold itself out as an entity separate from any affiliate.

(m)  For purposes of this amendment, the following terms shall have the following meanings:

"affiliate" means any person controlling or controlled by or under common control with the Partnership including, without limitation (i) any person who has a familial relationship, by blood marriage or otherwise with any Partner or employee of the Partnership, or any affiliate thereof and (ii) any person which receives compensation for administrative, legal or accounting services from this Partnership, or any affiliate. For purposes of this definition "control" when used with respect to any specific person, means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meaning correlative to the foregoing.

"person" means any individual, corporation, Partnership, limited liability company, joint venture, association joint stock company, trust (including any beneficiary thereof), unincorporated organization, or government or any agency or political subdivision thereof.

5.  Dissolution: (a)  Subject to applicable law, dissolution of the partnership must not occur so long as the Partnership remains owner of the Property subject to the First Mortgage.

(b)  The Partnership shall not terminate or dissolve solely as a consequence of the bankruptcy an insolvency of one or more of the

E. Rice 850

Partners of the Partnership, but the Partnership shall continue so long as there remains a solvent partner exists.

6. Managing Partners: Additional Paragraph 8(I) is added to the Partnership Agreement as follows: The Partners do hereby consent and authorize the managing Partners, CHARLES GROSS and MADELINE GROSS to execute the necessary documents for the refinance of the Partnership property with the FIRST UNION NATIONAL BANK of NORTH CAROLINA, said Mortgage in the amount of $_____ _____ Dollars).

7. Agreement: All other terms and conditions of the General Partnership Agreement dated January 23, 1990 is republished and shall remain in full force and effect with the above provisions being an integrate part of the General Partnership Agreement and the Partners' obligations thereunder.

IN WITNESS WHEREOF, the parties hereto with the intent to be legally bound hereby have set their hands and seals on the date and year first above written.

WITNESS:

GENERAL PARTNERS:

Charles D. Gross

Madeline S. Gross

Donald Plung

Howard Plung

Alexander Silverman

Rosalyn Silverman

Gregg Perelman

E. Rice 851

Harvey E. Robins

Richard Kelly

KASDAN, WEISMAN & TALBOTT
ASSOCIATES

By: _Richard B Kasdan. M D_
Richard B. Kasdan, M.D.

By: _Richard A Weisman MD_
Richard A. Weisman, M.D.

By: _John B Talbott_
John B. Talbott, M.D.

A 13.07% owner in the property in which the Partnership
holds title as Trustee for the said Nathan Rice, Inc. under the
terms of the Partnership Agreement does hereby agree and consent to
the above Amendment and agrees to be bound thereby.

ATTEST:                                   NATHAN RICE, INC.

_Edward R Rice_                           By: _Sidney Rice_
asst. Sec                                 Sidney Rice, President

E. Rice 852

**Addendum**
**to the General Partnership Agreement of**
**Hempstead Road Associates**


This Addendum is made as of the 26th day of February, 1998 by Todd E. Reidbord, Gregg Perelman, Sally P. Lehman and Brad Perelman (collectively the "New Partners")

Recitals:

A.   Charles D. Gross, Madeleine Gross, Donald Plung, Howard Plung, Alexander Silverman, Rosalyn Silverman, Kasdan, Weisman & Talbott Associates, Richard Kelly, Harvey E. Robins, Gregg Perelman and Nathan Rice, Inc. (collectively the "Original Partners") entered into a General Partnership Agreement of Hempstead Road Associates dated as of June 23, 1990 as amended April 30, 1997 (the "Partnership Agreement") a copy of which has been provided to the New Partners.

B.   Charles D. Gross and Madeleine Gross have sold their 20.9% general partnership interests to the New Partners pursuant to the terms of a Partnership Interest Purchase Agreement dated as of June 16, 1997.

NOW, THEREFORE, for good and valuable consideration, intending to be legally bound hereby, the New Partners covenant and agree as follows:

1.   The New Partners hereby agree to be bound by the terms and conditions of the Partnership Agreement as if each of the New Partners had executed the Partnership Agreement. The ownership interests of each of the New Partners is set forth on Exhibit A attached hereto and made a part hereof.

2.   All of the terms and conditions set forth in the Partnership Agreement are hereby ratified and confirmed by the New Partners.

IN WITNESS WHEREOF, the New Partners have executed this Addendum as of the date first written above.

Witness:

Sally P. Lehman    parent of Attorney

Brad Perelman

Gregg Perelman

Todd E. Reidbord

E. Rice 854

EXHIBIT A

PERCENTAGE INTEREST

| | | |
|---|---|---|
| GREGG PERELMAN* | | 9.94% |
| BRAD PERELMAN | | 4.98% |
| SALLY LEHMAN | | 4.98% |
| TODD REIDBORD | | 1.00% |
| | TOTAL: | 20.9% |

*When combined with his existing interest in the partnership, Gregg Perelman holds a 20.56% interest in Hempstead Road Associates

E. Rice 855

AMENDMENT TO PARTNERSHIP AGREEMENT
OF
HEMPSTEAD ROAD ASSOCIATES

This Amendment is made as of April 29, 2004 by and among Donald Plung,
Howard Plung, Alexander Silverman, Rosalyn Silverman, Kasdan Weisman and Talbot
Associates, Richard Kelly, Harvey E. Robins, Gregg Perelman, Sally Lehman Perelman,
Brad Perelman and Todd E. Reidbord, herein collectively referred to as the Partners" and
individually as a "Partner", and Nathan Rice, Inc. ("NR")

RECITALS:

A.   The Partners and NR entered into a General Partnership Agreement under
the name of "Hempstead Road Associates" dated as of January 23, 1990
as amended by Agreements dated April 30, 1997and February 26, 1998,
(the "Partnership Agreement")

B.   The Partners and NR desire to amend the Partnership Agreement as a
condition of obtaining a new mortgage loan from Morgan Stanley
Mortgage Capital, Inc. as hereinafter described. (All capitalized terms
used herein shall have the meanings as set forth in the Partnership
Agreement)

NOW THEREFORE, for good and valuable consideration, intending to be legally
bound hereby, the parties hereto covenant and agree as follows:

1.   Paragraph 2 of the Amendment to the Partnership Agreement dated as of
April, 30, 1997, is hereby amended to reflect that the Partnership is re-financing the
existing mortgage (originally in favor of First National Bank of North Carolina) with
Morgan Stanley Mortgage Capital, Inc, its successors and assigns ("MSMC"). Therefore,
in said Paragraph 2, all references to the First Mortgage holder shall hereafter mean:
Morgan Stanley Mortgage Capital. Inc, its successors and assigns. All references in the
Partnership Agreement to the "First Mortgage", shall mean the mortgage to be given to
MSMC by the Partnership encumbering the Property in the original principal amount of
$3,850,000.

2.   The Partners and NR hereby appoint and confirm Todd E. Reidbord as the
"Managing General Partner" of the Partnership. The Partners and NR hereby consent and
authorize the Managing General Partner, Todd E. Reidbord, to execute the necessary
documents for the Partnership in connection with the mortgage loan to be made by MSCI
in the original principal amount of $3,850,000.

3.   All other terms and conditions of the Partnership Agreement shall remain
in full force and effect.

E. Rice 856

4.     This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

Sally P. Lehman

Brad Perelman

Gregg Perelman

Todd B. Reidbord,
Managing General Partner

Donald Plung

Howard Plung

Alexander Silverman

Rosalyn Silverman

Harvey E. Robins

Richard Kelly

4.    This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

_____          Sally P. Lehman

_____          Brad Perelman

_____          Gregg Perelman

_____          Todd E. Reidbord,
                                 Managing General Partner

_____          Donald Plung

_____          Howard Plung

_____          Alexander Silverman

_____          Rosalyn Silverman

_____          Harvey E. Robins

_____          Richard Kelly

E. Rice 858

4.     This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

_____          _____
                                 Sally P. Lehman

_____          _____
                                 Brad Perelman

_____          _____
                                 Gregg Perelman

_____          _____
                                 Todd E. Reidbord,
                                 Managing General Partner

_____          _____
                                 Donald Plung

_____          _____
                                 Howard Plung

_____          _____
                                 Alexander Silverman

_____          _____
                                 Rosalyn Silverman

_____          _____
                                 Harvey E. Robins

_____          _____
                                 Richard Kelly

E. Rice 859

4.      This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

_____          _____
                                    Sally P. Lehman

_____          _____
                                    Brad Perelman

_____          _____
                                    Gregg Perelman

_____          _____
                                    Todd E. Reidbord,
                                    Managing General Partner

_____          _____
                                    Donald Plung

_____          _____
                                    Howard Plung

                                    _____
                                    Alexander Silverman

                                    _____
                                    Rosalyn Silverman

_____          _____
                                    Harvey E. Robins

_____          _____
                                    Richard Kelly

E. Rice 860

4.       This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

_____

_____                    Sally P. Lehman

_____                    Brad Perelman

_____                    Gregg Perelman

_____                    Todd E. Reidbord,
                                              Managing General Partner

_____                    Donald Plung

_____                    Howard Plung

_____                    Alexander Silverman

_____                    Rosalyn Silverman

_____                    Harvey E. Robins

_____                    Richard Kelly

E. Rice 861

4.      This Amendment may be executed in counterparts, but all such counterparts shall be deemed one agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the date first written above.

Witness:

_____                    _____
                                            Sally P. Lehman

_____                    _____
                                            Brad Perelman

_____                    _____
                                            Gregg Perelman

_____                    _____
                                            Todd E. Reidbord,
                                            Managing General Partner

_____                    _____
                                            Donald Plung

_____                    _____
                                            Howard Plung

_____                    _____
                                            Alexander Silverman

_____                    _____
                                            Rosalyn Silverman

_____                    _____
                                            Harvey E. Robins

                                            _____
                                            Richard Kelly

KASDAN, WEISMAN &
TALBOTT
ASSOCIATES

By: _____
Richard B. Kasdan, MD

By: *Richard Ahlesman*
Richard A. Weisman, MD

By: _____
John B. Talbott, MD

    As 13.075% owner in the property in which the Partnership holds title as Trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above Amendment and agrees to be bound thereby.

Attest:

NATHAN RICE, INC.

_____

By: _____
Sidney Rice, President

E. Rice 863

KASDAN, WEISMAN &
TALBOTT
ASSOCIATES

By: _____
Richard B. Kasdan, MD

By: _____
Richard A. Weisman, MD

By: _____
John B. Talbott, MD

As 13.075% owner in the property in which the Partnership holds title as Trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above Amendment and agrees to be bound thereby.

Attest:

NATHAN RICE, INC.

_____

By: _____
Sidney Rice, President

E. Rice 864

KASDAN, WEISMAN &
TALBOTT
ASSOCIATES

By: _____
Richard B. Kasdan, MD

By: _____
Richard A. Weisman, MD

By: _____
John B. Talbott, MD

As 13.075% owner in the property in which the Partnership holds title as Trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above Amendment and agrees to be bound thereby.

Attest:

NATHAN RICE, INC.

_____

By: _____
Sidney Rice, President

E. Rice 865

KASDAN, WEISMAN &
TALBOTT
ASSOCIATES

By: _____
Richard B. Kasdan, MD

By: _____
Richard A. Weisman, MD

By: _____
John B. Talbott, MD

     As 13.075% owner in the property in which the Partnership holds title as Trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above Amendment and agrees to be bound thereby.

Attest:

_____

NATHAN RICE, INC.

By: _____
Sidney Rice, President

E. Rice 866

**CORPORATE RESOLUTION OF
NATHAN RICE, INC., A PENNSYLVANIA CORPORATION
HELD ON MAY 3, 2004**

At a duly constituted Corporate Meeting of Nathan Rice, Inc., all Board Members and Stockholders being present, the following resolution was unanimously adopted.

WHEREAS, Nathan Rice, Inc. (hereafter referred to as "NR") holds an ownership interest with Hempstead Road Associates, (hereafter referred to as "Partners") being apartment houses ty located on Wightman Street and Hempstead Road in the 14th Ward of the City of Pittsburgh, Allegheny County, PA, and

WHEREAS, new financing is to occur with Morgan Stanley Mortgage Capital, Inc. in the amount of $3,850,000.00, and

WHEREAS, the Partners and NR entered into a General Partnership Agreement under the name of "Hempstead Road Associates dated as of January 23, 1990 as amended by Agreements dated April 30, 1997 and February 26, 1998, (the "Partnership Agreement"), and

WHEREAS, the Partners and NR desire to amend the Partnership Agreement as a condition of obtaining a new mortgage loan from Morgan Stanley Mortgage Capital, Inc. as hereinafter described. (All capitalized terms used herein shall have the meanings as set forth in the Partnership Agreement)

RESOLVED THAT THE FOLLOWING IS ADOPTED:

1.  Paragraph 2 of the Amendment to the Partnership Agreement dated as of April 30, 1997, is hereby amended to reflect that the Partnership is re-financing the existing mortgage (originally in favor of First National Bank of North Carolina) with Morgan Stanley Mortgage Capital, Inc., its successors and assigns.("MSMC"). Therefore, in said Paragraph 2, all references to the First Mortgage holder shall hereafter mean: Morgan Stanley Mortgage Capital, Inc. its successors and assigns. All references in the Partnership Agreement to the "First Mortgage", shall mean the mortgage to be given to MSMC by the Partnership encumbering the Property in the original principal amount of $3,850,000.

2.  The Partners and NR hereby appoint and confirm Todd E. Reidbord as the "Managing General Partner" of the Partnership. The Partners and NR hereby consent and authorize the Managing General Partner, Todd E. Reidbord, to execute the necessary documents for the Partnership in connection with the mortgage loan to be made by MSMC in the original principal amount of $3,850,000.

128886.1

E. Rice 867

3.    All other terms and conditions of the Partnership Agreement shall remain in full force and effect.

This Resolution is hereby certified to be part of the Corporate Records as of May 3, 2004.

Attest:

NATHAN RICE, INC.

_E. ... R. Rice_
Secretary

By: _Sidney Rice_ _____
Sidney Rice, President

128886.1

E. Rice 868

# EXHIBIT "D"



**Walnut Capital Management**
5500 Walnut Street, Suite 300
Pittsburgh, PA 15232

**o. 412.683.3810**
leasing@walcap.com
*walnutcapital.com*

June 21, 2018

Herbert L. Rice
7509 Rigby Court
Lakewood Ranch, FL 34202

Re:     Hempstead Road Associates
        Change in Ownership Title

Dear Mr. Rice

Pursuant to your earlier correspondence, we have as of today retitled your ownership interest in Hempstead Road Associates as follows:

**Herbert L. Rice and Suezette H. Rice, WROS (with right of survivorship)**

If this was not your intention, please contact our office immediately.

Sincerely,

Michael A Goldstein, CPA
Chief Financial Officer

# EXHIBIT "E"

| | |
|---|---|
| **From:** | Todd Reidbord |
| **Sent:** | Monday, September 14, 2020 1:47 PM |
| **To:** | Marc Levine |
| **Cc:** | Michael Goldstein |
| **Subject:** | RE: Hempstead Road Associates |

Got it.  Thanks

Todd Reidbord
*President and Founding Partner*



Walnut Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
o  412.683.3810  ·· c  412.980.5852
walnutcapital.com

From: Marc Levine <mlevine@louisplung.com>
Sent: Monday, September 14, 2020 1:44 PM
To: Todd Reidbord <treidbord@walcap.com>
Cc: Michael Goldstein <mgoldstein@walcap.com>
Subject: RE: Hempstead Road Associates

Todd:

I don't want this to look like it is going through us.  Please email Beth and I directly that you've reconsidered some facts and you are willing to make the sale from NRI happen quickly.  Don't let them see our string of communications... please.  To accomplish that objective, you are increasing your offer to $100,000.  Let them know that this offer is over 33 times their average annual distributions they received over the last few years.  Thanks.

Marc

**Marc A. Levine** , CPA, J.D.
Director of Tax
phone: 412-281-8771
cell: 412-445-8704
fax: 412-745-7587



*The highest compliment we can receive is your referral*

420 Ft. Duquesne Blvd., Ste. 1900
Pittsburgh, PA 15222
www.louisplung.com

From: Todd Reidbord <treidbord@walcap.com>
Sent: Monday, September 14, 2020 1:34 PM
To: Marc Levine <mlevine@louisplung.com>
Cc: Michael Goldstein <mgoldstein@walcap.com>
Subject: RE: Hempstead Road Associates

Make the deal for $100,000. We will do it for that ASAP. See what you can do ☺ Thanks.

Todd Reidbord
*President and Founding Partner*

WALNUT CAPITAL

Walnut Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
o: 412 683 3810 • c: 412 980 5852
walnutcapital.com

---

**From:** Marc Levine <mlevine@louisplung.com>
**Sent:** Monday, September 14, 2020 12:53 PM
**To:** Todd Reidbord <treidbord@walcap.com>
**Cc:** Michael Goldstein <mgoldstein@walcap.com>
**Subject:** RE: Hempstead Road Associates

Todd:

EJ just sent me the attached valuation report prepared for Gregg Perelman and Arlene Weisman for estate and inheritance tax purposes (which means they were trying to keep the value down) dated as of 2/1/19. How do you reconcile this valuation of a minority interest in the partnership with your capitalized cash flow valuation? The appraisal had layered marketability discounts of 50% (20% plus 30%) and layered lack of control (minority) discounts of 8% (3% plus 5%). With all of those discounts, they still valued a 4.98% interest (for estate planning purposes) at $99,600. A similar valuation of the HR divisions interest at that time should have yielded a fair market value equal to $119,825.76 (including discounts) (4.98/99600 = 5.991288/X).

I don't want to cause any issues, as they really aren't my client, however, they may ask if you are aware of anything similar to this. Does this make sense? All I know is they will be difficult to convince on a sales price and the higher it is (with more logic to support it) the better chance this will happen. Thanks.

Marc

**Marc A. Levine**, CPA, J.D.
Director of Tax
phone: 412-281-8771
cell: 412-445-8704
fax: 412-745-7587

*The highest compliment we can receive is your referral*

Louis Plung & Company
420 Ft. Duquesne Blvd., Ste. 1900
Pittsburgh, PA 15222
www.louisplung.com

---

**From:** Todd Reidbord <treidbord@walcap.com>
**Sent:** Monday, September 14, 2020 12:00 PM
**To:** Marc Levine <mlevine@louisplung.com>
**Cc:** Michael Goldstein <mgoldstein@walcap.com>
**Subject:** RE: Hempstead Road Associates

We do not have any FMV valuations, as the property has not be re-financed since 2013. We provide the financial statements on a quarterly basis. Michael Goldstein can provide you these.

Do you have an idea of what they are thinking, in terms of value. As you know, we have distributed significant re-financing proceeds since we took over management of the partnership.

Thanks.



Todd Reidbord
*President and Founding Partner*

Walnut Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
o  412 683 3810 ·· c  412 580 5852
walnutcapital.com

**From:** Marc Levine <mlevine@louisplung.com>
**Sent:** Monday, September 14, 2020 11:57 AM
**To:** Todd Reidbord <treidbord@walcap.com>
**Subject:** RE: Hempstead Road Associates

Todd:

Do you have any fair market valuations / net asset value as of at least the first of the year? I don't want to create problems (as we just want Suezette and Herb Rice out of NRI and this is the last piece), however, they may think the valuation is too low. I assume they will ask for the same and I just wanted to see the latest financials and fair market valuation for Hempstead Road Associates. I won't provide this to Beth and/or Herbert without your approval. Thanks.

Marc

**Marc A. Levine**, CPA, J.D.
Director of Tax
phone: 412-281-8771
cell: 412-445-8704
fax: 412-745-7587

 Li

*The highest compliment we can receive is your referral*



420 Ft. Duquesne Blvd., Ste. 1900
Pittsburgh, PA 15222
www.louisplung.com

**From:** Todd Reidbord <treidbord@walcap.com>
**Sent:** Monday, September 14, 2020 11:09 AM
**To:** Beth Tarasi <emt@tarasilaw.com>
**Cc:** Michael Goldstein <mgoldstein@walcap.com>; Gregg Perelman <gperelman@walcap.com>; Marc Levine <mlevine@louisplung.com>
**Subject:** RE: Hempstead Road Associates

Hi Beth and Marc

Based on our analysis, we have been distributing approximately $60,000 per year from this partnership. This takes into account the existing income and expenses, capital requirements and debt payments. If we cap this at 5%, this results in a value of $1,200,000 for the total equity. The HR interest (45.84% of 13.07%) is worth $71,895.46. We are not applying any minority discount or costs of sale.

Let us know if this analysis makes sense to you.

Thanks.

Todd Reidbord
*President and Founding Partner*



Walnut Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
o  412.683.3810 ·· c  412.980.5852
walnutcapital.com



**From:** Beth Tarasi <emt@tarasilaw.com>
**Sent:** Friday, September 11, 2020 11:27 AM
**To:** Todd Reidbord <treidbord@walcap.com>
**Cc:** Michael Goldstein <mgoldstein@walcap.com>; Gregg Perelman <gperelman@walcap.com>; E.J. Strassburger <estrassburger@smgglaw.com>; Thomas W King III (TKing@dmkcg.com) <TKing@dmkcg.com>; Marc Levine <mlevine@louisplung.com>
**Subject:** RE: Hempstead Road Associates

Todd,

Thank you for your email. Also – Michael Goldstein, thank you for getting this on the agenda.

My client (Herbert Rice/Suezette Rice) is interested in obtaining a fair market value/offer for their interest in Hempstead.
The partnership holds as Trustee an undivided  13.07% of the fee title to said real estate. NRI Inc has two divisions HR 45.84% and SR 54.16%. Yes, I understand that it is an undivided interest and I have been working with EJ Straussburger (who represents Ed Rice) to resolve all the issues with NRI Inc. ( I have cc'd E.J. on this email). Tom King Esq and Marc Levine have also been working with me to get this resolved. (I have cc'd Tom and Marc on this email)

The cleanest way to resolve this is for NRI Inc to liquidate its interest in Hempstead. The Hempstead partnership agreement provides for the (see, 13 (b) Transfer of partnership interest)

I believe Greg Perelman has a good handle of the reasonable value of the undivided 13.07% of the fee title to said real estate held by Hempstead.

I will await your response.
If anyone else wishes to chime in, please do.
Thank you,

Beth Tarasi Esq.





Tarasi & Tarasi P.C.
Phone 412-391-7135
Mobile 412-519-5404
Fax 412-471-2673
Web www.tarasilaw.com
Email emt@tarasilaw.com
510 Third Ave. 2nd Fl.
Pittsburgh, Pa 15219

**From:** Todd Reidbord <treidbord@walcap.com>
**Sent:** Friday, September 11, 2020 10:33 AM
**To:** Beth Tarasi <emt@tarasilaw.com>
**Cc:** Michael Goldstein <mgoldstein@walcap.com>; Gregg Perelman <gperelman@walcap.com>
**Subject:** Hempstead Road Associates

Hi Beth

Michael gave me your email.  As we discussing a sale of the entire Nathan Rice, Inc. interest
as a joint venture partner in Hempstead Road Associates  Let us know what you are
contemplating and we can give you a better idea of the value.

Happy to get on a call to discuss. Thanks.



Todd Reidbord
President and Founding Partner

Walnut Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
o 412 683 3810 · c 412 980 5852
walnutcapital.com



E. Rice 109

# EXHIBIT "F"

**From:**     Todd Reidbord
**Sent:**     Monday, December 14, 2020 2:38 PM
**To:**       Marc Levine
**Subject:**  FW: Nathan Rice, Inc. Shares of Hempstead Road Associates

---

Give me a call when you have a minute.  Thanks



Todd Reidbord
*President and Founding Partner*

Walnus Capital Management
5500 Walnut Street, Suite 200
Pittsburgh, PA 15232
◊  412 683 3810 ·· c  412 980 5852
walnutcapital.com



**From:** John Bench <JBench@dmkcg.com>
**Sent:** Monday, December 14, 2020 2:33 PM
**To:** treidbord@walcap.com; Michael P. Gaetani <mgaetani@smgglaw.com>; mlevine@louisplung.com
**Cc:** Thomas W King III <TKing@dmkcg.com>
**Subject:** Nathan Rice, Inc. Shares of Hempstead Road Associates

Dear Todd, Mike, and Marc,

As a follow-up to my December 10, 2020 email in which I advised Todd that our clients, Herbert and Suezette Rice, have not reached any agreement with Nathan Rice, Inc. as to the sale or disposition of our clients' interest in Hempstead Road Associates, I write to ask that you cease and desist, until the disposition of the matters at-issue between the Nathan Rice shareholders, any efforts to sell, transfer, or make any other disposition of our clients', or Nathan Rice's, interest in Hempstead Road.

Please do not hesitate to contact us to discuss the matters raised herein.

John J. Bench
Dillon, McCandless, King, Coulter & Graham, L.L.P.
600 Cranberry Woods Drive, Suite 175
Cranberry Twp., PA  16066
(724) 776-6644
(724) 776-6608 (FAX)
jbench@dmkcg.com



CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received

# EXHIBIT "G"

# APPRAISAL OF REAL ESTATE

**Hempstead Apartments**
5615-5625, 5628, 5629, 5635, 5645 Hempstead Road and
2105, 2019 Wightman Streets
14th Ward, City of Pittsburgh
Allegheny County, Pennsylvania 15217

# PREPARED FOR

Dollar Bank, FSB
3 Gateway Center, 10 East
Pittsburgh, Pennsylvania 15222

November 17, 2020

20-0695



November 17, 2020

Ms. Kathy Chermak
Dollar Bank, FSB
3 Gateway Center, 10 East
Pittsburgh, Pennsylvania 15222

Dear Ms. Chermak,

In response to your request, and for the purpose of estimating the Market Value of the Leased Fee Estate, I have appraised the property located and known as:

**Hempstead Apartments**

5615-5625, 5628, 5629, 5635, 5645 Hempstead Road and
2105, 2019 Wightman Streets
14th Ward, City of Pittsburgh
Allegheny County, Pennsylvania 15217

This appraisal has been prepared in accordance with the Code of Ethics of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice (USPAP) and Title XI of the Federal Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). This Appraisal Report is intended to comply with Standards Rule 2-2 of USPAP. The report includes all information that is pertinent to arriving at the market value estimate.

The subject site consists of seven rectangular shaped parcels that contain 1.651 acres or 71,900 square feet. The property includes six contiguous parcels that total 63,334 square feet. The seventh parcel is directly across the street on Hempstead Road. It contains 8,566 square feet. The seven parcels are improved with eight freestanding apartment buildings. The combined gross building area is 91,242 square feet, exclusive of basements. The gross rentable area is 75,413 square feet. The buildings completed in 1920. The overall condition of the buildings is average to good. At the time of the site inspection, the occupancy rate was 95.5%.

The appraisal was prepared for the exclusive use of the identified user. Any use of this appraisal by any other person or entity, or any reliance or decisions based on this appraisal, are the sole responsibility and at the sole risk of the third party. Neither White Realty Advisors nor the individual appraisers, accept any responsibility for damages suffered by third parties as a result of reliance on, decisions made, or actions taken based on this report.

Ms. Kathy Chermak                                                    November 17, 2020
Dollar Bank, FSB                                                              Page Two

On March 11, 2020, the global outbreak of a "novel coronavirus" (aka COVID-19) was declared a pandemic by the World Health Organization (WHO). As the conditions related to the pandemic have spread across the United States, and throughout the world, it has created extreme volatility in the financial markets. The long term impact on the national and local economies will not be known until such time that the spread of the virus has been contained. An extended outbreak could result in a diminution in property values, however, to date, there is insufficient data to accurately quantify any change in market values. The value conclusion that is arrived at in this report is based on the best information that is available as of the effective date of the appraisal.

As a result of my investigations, my opinion of the Market Value, of the Leased Fee Estate, in terms of cash or its equivalence of the above captioned property as of October 30, 2020 is as follows:

**Twelve Million Three Hundred Fifty Thousand ($12,350,000) Dollars**

Respectfully submitted,

James J. White, MAI
PA Certified General R.E. Appraiser
GA-001373-L

WHITE REALTY ADVISORS, LLC

## TABLE OF CONTENTS

Summary of Facts ............................................................................................................. 1

Introduction ..................................................................................................................... 2

Regional Data ................................................................................................................ 28

Neighborhood Data ....................................................................................................... 32

Site Description .............................................................................................................. 34

Description of the Improvements .................................................................................. 37

Highest and Best Use .................................................................................................... 40

Appraisal Methodology ................................................................................................. 44

Income Approach to Value ............................................................................................ 45

Sales Comparison Approach ......................................................................................... 62

Reconciliation and Final Value Estimate ...................................................................... 67

WHITE REALTY ADVISORS, LLC

## SUMMARY OF FACTS

| | |
|---|---|
| Property Identification | **Hempstead Apartments** |
| | 5615-5625, 5628, 5629, 5635, 5645 Hempstead Road and 2105, 2019 Wightman Streets |
| | 14th Ward, City of Pittsburgh |
| | Allegheny County, Pennsylvania 15217 |
| Site Description | The site contains a gross land area of 1.65 acres or 71,900 square feet. The parcels are irregular in shape and the topography is level. The zoning is "RM-M; Moderate Density Residential District" . The site is located within a Zone X, an area outside of the flood zone |
| Building Description | The subject consists of eight, freestanding apartment buildings. The buildings contain 90 units and a gross building area of 91,242 square feet. The net rentable area is 75,413. At the time of the inspection the buildings were 95.55 percent occupied. The buildings were constructed in 1920 and are in average to good condition. |

**Highest and Best Use**

| | |
|---|---|
| As Vacant | Multi-family development |
| As Improved | Existing apartment buildings |
| **Valuation Scenarios** | **As Is** |
| Cost Approach | Not Developed |
| Income Approach | $12,325,000 |
| Sales Comparison Approach | $12,375,000 |
| Overall Value Estimate | $12,350,000 |
| Effective Date of Appraisal | October 30, 2020 |
| Date of Final Inspection | October 30, 2020 |

## INTRODUCTION

**Extraordinary Market Conditions**

The regional, national and world economies have been adversely impacted by the Covid-19 pandemic. The outbreak was declared a pandemic by the World Health Organization on March 11, 2020. As the outbreak has spread across the world, its impact on financial markets, and the economy in general, has intensified. The instability in the financial markets have had, at least temporarily, an impact on commercial real estate. As of the effective date of the appraisal, we recognize that we can attach less weight to previous market evidence for comparison purposes to form opinions of value. Indeed, the current response to COVID-19 means that we are faced with an unprecedented set of circumstances on which to base a judgement. Consequently, less certainty, and a higher degree of caution, should be attached to our valuation than would normally be the case. The opinion of value is based on estimates and forecasts that are prospective in nature and subject to risk and uncertainty. Events may occur that materially alter the performance of the property. We recommend a more frequent review of this valuation and advise the intended user to consider the lack of economic stability in evaluating the use and reliability of the opinions expressed herein.

**Property Identification & Legal Data**

The subject of this report is the 90 unit apartment complex located at 5615-5625, 5628, 5629, 5635, 5645 Hempstead Road and 2105, 2019 Wightman Streets in the 14th Ward of the City of Pittsburgh, Allegheny County, Pennsylvania. The owner identifies the property as the Hempstead Apartments. According to the Allegheny County assessment records, the property is identified as tax parcels 87-B-195, 87-B-160, 87-B-178, 87-B-177, 87-B-176, 87-B-198, 87-B-196. Property rights are currently vested in the name of Hempstead Road Associates. The parcels last transferred via a deed dated February 9, 1990 as recorded in Deed Book Volume/Page 8189/188. To the best of my knowledge title to the property has not changed in the past three years, nor are any sales or options pending.

## INTRODUCTION

**Property Rights Appraised[1]**

There are several interests in real property that are defined as follows:

➢ Fee Simple Estate:  Absolute ownership unencumbered by any other interest or estate, but subject only to the limitations imposed by the government powers of taxation, eminent domain, police power, and escheat.  An inheritable estate.

➢ Leased Fee Estate:  An ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of the lessor (the leased fee owner) and leased fee are specified by contract terms contained within the lease.

➢ Leasehold Estate:  The right to use and occupy real estate for a stated term and under certain conditions; conveyed by a lease.

Valuing any one or all of the estates of a property is possible. For a property such as the subject, valuing the Leased Fee Estate is common.  This reflects that the apartment units are leased.

**Purpose of the Appraisal**

The purpose of the appraisal is to estimate the current Market Value of the Leased Fee Estate of the subject property.

**Intended Use of the Appraisal**

The intended use of the appraisal is to assist the client, Dollar Bank, FSB, in estimating the Market Value of the property. This valuation assignment was developed consistent with the scope specified by Dollar Bank.

**Intended User**

The intended users include Dollar Bank, FSB, any participant, assignee, or other transferee.

---

[1] Appraisal of Real Estate, 14th Edition; Appraisal Institute

## INTRODUCTION

**Zoning**

According to the zoning map for City of Pittsburgh, the parcels are zoned "RM-M; Moderate Density Residential District". Additional discussion on the applicable zoning code appears in the Highest and Best Use section of the appraisal.



**Scope of the Appraisal**

The scope of work completed in developing the value estimate included the following

➢ Exposure Period: Identify the scope of the marketing effort and potential buyers. Then estimate the exposure period based on the final value estimate, characteristics of the property, comparable sales and periodic discussions with brokers.

➢ Area Data: Identify factors that may impact the development and operation of the property. Information presented in the Area Data was obtained from multiple sources, including local economic and development agencies, the Census Bureau and demographic services.

➢ Property Description: Inspection of the property, neighborhood and comparable developments. Examine site characteristics. Data presented is based on a personal inspection of the site and county records. A complete inspection took place on October 30, 2020. The reference to the land area is based on Allegheny County assessment records. The calculations for the gross building area are based on assessment records. The rentable area calculation is based on the landlord's rent roll dated October 28, 2020.

## INTRODUCTION

➢ Highest and Best Use: The discussion reflects zoning and land use restrictions in place of the effective date of appraisal, physical site characteristics, the nature of adjoining and nearby land uses, and the relationship between development and ultimate value for potential improvements.

➢ Improved Valuation: Development of valuation analyses considering the Cost, Income Capitalization and Sales Comparison Approaches to value. Each approach is further discussed in the Methodology section of this report.

➢ A survey and analysis of the apartment market with respect to rental rates, occupancy rates, absorption rates and operating expenses, as well as historical trends within each of these areas of interest.

➢ Research of recent sales involving apartment complexes within the Greater Pittsburgh Metropolitan Area.

➢ Reconciliation: Each approach is reviewed for market orientation and the number of judgements required to develop the value estimate. Market orientation is given primary weight, with the judgement factor having a secondary influence on the weight given to each indicator. A final value estimate is then presented.

## Market Value Defined[2]

The most probable price which a property should bring in the competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a. Buyer and seller are typically motivated.

b. Both parties are well informed or well advised and each acting in what they consider their own best interest.

c. A reasonable time is allowed for exposure in the open market

d. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

---

[2] Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989

## INTRODUCTION

e.  The price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**Regional Market Trends**

The subject is an eight-building, 90-unit apartment complex.  The buildings were completed in 1920 and are currently 95.5% leased. The buildings are located in the Squirrel Hill section of Pittsburgh which is one of the strongest apartment markets in the region. The location of the buildings is within a concentration of multi-family properties. In addition, the main commercial district in Squirrel Hill is within walking distance of the property.

The following discussion focuses on trends that are impacting multifamily properties.  The analysis begins with the regional trends and then considers the local sub market. According to the *CoStar* for Metropolitan Pittsburgh there are 133,585 rental units. Over the past five years, the changes to the supply of units have been as follows:



## **INTRODUCTION**

On a regional basis, the number of new units to come on-line peaked in 2015. During 2015, 2,792 units were completed throughout the region. The number of new deliveries has been declining in each of the past four years. During 2019, 1,162 units were delivered in the Pittsburgh Regional market. The majority of the new units that have been completed in recent years are located in either Pittsburgh's Central Business District, the Fringe neighborhoods or the northern suburbs. The absorption of new units peaked at 3,089 in 2017. The absorption of the new units has outpaced the deliveries resulting in a declining vacancy rate.

## **Vacancy**

With the changes in the supply of available units, the regional vacancy rate had been trending upward in recent years. As recently as 1st Quarter 2017, the stabilized vacancy rate at the regional level was 6.83%. More recently, the rate has declined to 4.82%. The decline in the vacancy rate coincides with the increased absorption during 2017 through 2019. CoStar reports annual vacancy rates as follows:



**INTRODUCTION**

Due primarily to the Covid-19 Pandemic, and the corresponding economic decline, CoStar is forecasting that vacancy rates will increase through the 3rd quarter of 2021, before returning to the historical average in the range of 5.00 to 6.00 percent.

**Rental Rates**

Average rental rates by unit type are presented in the following table:

| Rental Rates | |
| --- | --- |
| **Unit Type** | **Average Monthly Rent** |
| Studio/Efficiency | $872 |
| One-Bedroom | $900 |
| Two-Bedroom | $1,081 |
| Three-Bedroom | $1,256 |

Effective rent growth since 2015 is illustrated in the following table:



Market Asking Rent Per Unit By Bedroom - Current Survey

## <u>INTRODUCTION</u>

Since the 2nd Quarter of 2015, the average asking rent on a one-bedroom unit has increased by 7.47 percent. The average increase for two bedrooms has been 8.17 percent. Among three bedroom units, average rents have increased by 7.06 percent. The changes to the supply of units on a region wide basis has resulted in downward pressure on achievable rents. With the projected increase in vacancy rates, CoStar is forecasting that achievable rents will decline in the near term. The projections from CoStar estimate that market rents will return to their current levels by the 2nd quarter of 2021 followed by annual growth of 1.50 to 2.00 percent.

## <u>Immediate Market</u>

The property is in the Squirrel Hill neighborhood of the City. Due to the built up nature of Squirrel Hill, there have been few changes to the supply of units for an extended period. New construction of apartments has occurred in Oakland, East Liberty and Bloomfield, however, most of the units that compete with the subject property are in older buildings, many of which date to the first half of the last century. Recent trends for apartments in Squirrel Hill are summarized as follows:



**INTRODUCTION**

According to CoStar, the vacancy rate for apartments in Squirrel Hill is 4.38 percent. The vacancy rate has been increasing over the past three quarters. As recently as the 3rd quarter of 2019, the vacancy in the neighborhood was 3.38 percent. Looking forward, CoStar is forecasting an increase in the vacancy rate through the 4th quarter of 2022. The projected vacancy rate at that time is only 5.44 percent before the market returns to its historical average of below 5.00 percent vacancy.

**Supply of Available Units**

The CoStar survey is based on 3,466 units in Squirrel Hill. The delivery of new units has been as follows:



## INTRODUCTION

### Demand Generators

The demand for multifamily units in the district is created by several factors including students from both Pitt and Carnegie Mellon, the growing presence of technology companies in the East End along with the proximity to the UPMC hospital complexes in Oakland. The campuses for both Pitt and CMU are within three miles of the property. Both campuses are accessible via public transportation which is throughout the neighborhood. The various hospitals that are associated with UPMC are also within three miles. Squirrel Hill also benefits from convenient access to I-376 and the Waterfront development in Homestead. And finally, the influx of new employees into East Liberty has created additional demand for housing in all of the nearby neighborhoods.

### Demographics

The demographics for the primary trade area are summarized as follows:

| Market Demographics | | | |
|---|---|---|---|
| | 1.0 Mile Radius | 3.0 Mile Radius | 5.0 Mile Radius |
| 2010 Census Population | 25,998 | 176,922 | 364,817 |
| 2020 Census Population | 25,665 | 177,423 | 364,682 |
| 2025 Estimated Population | 25,454 | 177,380 | 365,285 |
| 2020 Per Capita Income | $52,892 | $35,938 | $34,402 |
| 2020 Median Household Income | $78,474 | $43,940 | $46,800 |
| 2020 Average Household Income | $117,833 | $75,027 | $73,157 |

Source: ESRI Business Information Solutions

The primary trade area is a heavily developed urban neighborhood in the City of Pittsburgh. The population in the immediate district is forecast to remain stable or increase slightly in the near term. Considering a 3.0-mile radius from the property, the median household income is estimated at $43,940. The income profile for the district is lower than the county in general. For Allegheny County, the median household income is $60,719.

**INTRODUCTION**

**Summary**

The subject consists of a 90-unit apartment complex.  The buildings are in the 14th Ward of the City of Pittsburgh.  The immediate district is a heavily developed urban neighborhood.  The location benefits from its proximity to both the universities in Oakland along with major employment centers in Oakland and East Liberty. The occupancy rate for apartments in Squirrel Hill is among the highest in the region. The built up nature of the neighborhood is such that there are significant barriers to entry.  The trends within the neighborhood have a positive impact on the subject property.

**Exposure Time**

Exposure time is "an opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at a market value on the effective date of the appraisal".[3]

The subject is a 90-unit apartment complex.  On the effective date of the appraisal, the occupancy rate for the complex was 95.5%. Based on discussions with numerous investors, as well as several recent articles and surveys, this property type is strongly sought after by both local and regional investors.  In considering a reasonable exposure period for the subject, we first reviewed industry publications such as the *PwC*, and the *RERC Real Estate Report*. Exposure periods suggest by the publications are summarized as follows:

| PwC 2nd Quarter 2020 Average Marketing Time | | |
|---|---|---|
| | Current Quarter | Last Quarter |
| Range | 1.00-12.00 | 1.00-9.00 |
| Average | 5.3 Months | 3.9 Months |

| RERC 2nd Quarter 2020 Average Marketing Time | | |
|---|---|---|
| | Current Quarter | Year Ago |
| Average | 5.5 Months | 4.0 Months |

---

[3] Standards of Professional Appraisal Practice of the Appraisal Institute, 2020 Edition.

## INTRODUCTION

Given the regional exposure that the property would likely receive, the desirability of the property type and the ready availability of financing, we estimate an exposure period of four months, with an additional two months for due diligence, financial arrangements and closing.

## General Limiting Conditions

This appraisal report has been made subject to the follow general limiting conditions:

➢ The opinion of value expressed in the letter of transmittal is the result of and subject to the data and conditions described in detail in the accompanying report.

➢ No fractional part of this appraisal is to be used in conjunction with another appraisal. Such use renders it invalid

➢ This report, or a copy thereof, may be transmitted to a third person or legal entity only in its entirety.

➢ Disclosure of the contents of this report is governed by the By-Laws and Regulations of The Appraisal Institute. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers or the firm with which they are connected) shall be disseminated to the public through advertising, public relations, news, sales or other media without the prior written consent and approval of the appraisers.

➢ Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such condition, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field if desired.

➢ The Americans with Disabilities Act ("ADA") became effective January 26, 1992. I (we) have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so this fact could have a negative effect upon the value of the property. Since I (we) have no direct evidence relating to this issue, I (we) did not consider possible noncompliance with the requirements of ADA in estimating the value of the property.

# INTRODUCTION

## General Assumptions

This appraisal report has been made subject to the following general assumptions:

➢ No responsibility has been assumed for the legal description or legal matters. Title to the property was assumed to be good and marketable unless otherwise stated.

➢ The property has been appraised free and clear of any and all liens or encumbrances unless otherwise stated.

➢ Responsible ownership and competent property management are assumed.

➢ Information furnished by others is believed to be reliable; however, no warranty is given for its accuracy.

➢ All engineering data were assumed to be correct. Plot plans and exhibits in this report have been included only to assist the reader in visualizing the property.

➢ It was assumed that there are no hidden or unapparent conditions of the property, subsoil or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.

➢ It was assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined and considered in the appraisal report.

➢ It was assumed that all licenses, certificates of occupancy, consents or other legislative or administrative authority required by any local, state or national government or private utility or organization have been or can be obtained or renewed for any sue on which the value estimate contained in this report is based.

➢ It was assumed that the utilization of the land and/or improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in this report.

## Extraordinary Assumptions and Hypothetical Conditions

➢ None noted

## INTRODUCTION

## Certification

I certify that, to the best of my knowledge and belief….

➢ The statements of fact contained in this report are true and correct

➢ The reported analysis, opinions, and calculations are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

➢ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

➢ I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

➢ I have no bias with respect to the property that is subject of this report or to the parties involved with this assignment.

➢ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

➢ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly to the intended use of this appraisal.

➢ My analyses, opinions, and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

➢ James J. White has made a personal inspection of the property that is the subject of this report.

➢ No one provided significant real property appraisal assistance to the person signing this certification.

➢ The use of this report is subject to the requirements of The Appraisal Institute relating to review by its duly authorized representatives.

➢ As of the date of this report, James J. White has completed the requirements of the continuing education program of the Appraisal Institute.

➢ This appraisal assignment was not based on a requested value, a minimum value, or approval of a loan.

**INTRODUCTION**

James J. White, MAI
PA Certified General R.E. Appraiser
GA-001373-L

# EXHIBIT "H"

| | |
|---|---|
| **From:** | Todd Reidbord |
| **Sent:** | Tuesday, December 15, 2020 5:26 PM |
| **To:** | E.J. Strassburger |
| **Subject:** | RE: Purchase/Sale of NRI SR Division's 54.14% interest in Hempstead property interest (13.07% in total) |

I spoke with Gregg, we are OK with your suggestion. Thanks

Todd E.Reidbord
President and Co-Founder
Walnut Capital Management, Inc.
5500 Walnut Street
Suite 300
Pittsburgh, PA 15232
412-683-3810    Office
412-980-5852    Cell
treidbord@walcap.com
www.walnutcapital.com

**From:** E.J. Strassburger <estrassburger@smgglaw.com>
**Sent:** Tuesday, December 15, 2020 5:02 PM
**To:** Todd Reidbord <treidbord@walcap.com>; Marc Levine <mlevine@louisplung.com>
**Cc:** Michael P. Gaetani <mgaetani@smgglaw.com>; Gregg Perelman <gperelman@walcap.com>; Michael Goldstein <mgoldstein@walcap.com>
**Subject:** RE: Purchase/Sale of NRI SR Division's 54.14% interest in Hempstead property interest (13.07% in total)

Todd: I received the document. I left a message on your cell to please give me a call at 412-491-1443. Thanks. EJ

**From:** Todd Reidbord <treidbord@walcap.com>
**Sent:** Tuesday, December 15, 2020 3:59 PM
**To:** Todd Reidbord <treidbord@walcap.com>; Marc Levine <mlevine@louisplung.com>
**Cc:** Michael P. Gaetani <mgaetani@smgglaw.com>; E.J. Strassburger <estrassburger@smgglaw.com>; Gregg Perelman <gperelman@walcap.com>; Michael Goldstein <mgoldstein@walcap.com>
**Subject:** RE: Purchase/Sale of NRI SR Division's 54.14% interest in Hempstead property interest (13.07% in total)

**CAUTION: This email originated from outside of the Firm. Do not click links or open attachments unless you recognize the sender and have confirmed that the content is safe.**

Guys

This is extremely time sensitive. We need you to get Ed to sign this today or tomorrow. Can you please respond that you received this email. Thanks.

Todd E.Reidbord
President and Co-Founder
Walnut Capital Management, Inc.
5500 Walnut Street
Suite 300
Pittsburgh, PA 15232
412-683-3810    Office
412-980-5852    Cell

treidbord@walcap.com
www.walnutcapital.com

**From:** Todd Reidbord <treidbord@walcap.com>
**Sent:** Tuesday, December 15, 2020 6:00 AM
**To:** Marc Levine <mlevine@louisplung.com>
**Cc:** mgaetani@smgglaw.com; E.J. Strassburger <estrassburger@smgglaw.com>; Gregg Perelman
<gperelman@walcap.com>; Michael Goldstein <mgoldstein@walcap.com>
**Subject:** RE: Purchase/Sale of NRI SR Division's 54.14% interest in Hempstead property interest (13.07%
in total)

Marc, and EJ

We are also in the process or refinancing Hempstead Road. Closing is on this Thursday. Attached is a
resolution that needs to be signed. We had hoped that this would not have been necessary from NRI ,
but now we need it.

Here is the email we sent the partners:

TO:  Hempstead Road Associates Partners

With the historically low interest rate environment and the debt markets being very
favorable to multi-family apartment loans, we have secured a commitment from Dollar
Bank to refinance this property. The new Loan Amount will be $9,262,500 with an
interest rate of approximately 3.1% that will be fixed for 10 years based on a 25 year
amortization period. The loan is "non-recourse" to the partnership and its partners.
 With the payoff of our existing loan – and a capital reserve of $1 million (mainly to
rebuild the balconies which are in bad shape) we expect to distribute approximately
$1.6 million, in the aggregate to the partners. We expect to close this loan around
December 17, 2020.   As you know these re-financing proceeds and are not subject to
income taxes.

This new loan will enable us to continue to maintain this property and grow rents over
time. With the new competition in the market, it is essential for us to keep up with
structural repairs, so that our units continue to achieve high rents. Walnut Capital
recommends we move forward with this loan.

Please sign the attached resolution and email it back to us. If you need us to deliver a
printed copy to you, please let us know. As always, please contact us directly if you
have any questions or need more information.

Please have Ed sign the attached and return it to us immediately. All of the other partners have signed.
Thanks and call me if you want to discuss.

Thanks.

E. Rice 051

# EXHIBIT "I"

Mallory Kasdan

ROSALYN SILVERMAN REVOCABLE TRUST

By:_____
Name:
Title:

ESTATE OF DONALD PLUNG

By:_____
Name:
Title:

13.675 % $\overline{ER}$

As a 5.993% owner in the property in which the Company holds as trustee for the said Nathan Rice, Inc. under the terms of the Partnership Agreement does hereby agree and consent to the above resolutions and agrees to be bound thereby.

NATHAN RICE, INC.

By: _____
Name: Edward R. Rice
Title: President

-4-

E. Rice 813

# EXHIBIT "J"



**Strassburger McKenna Gutnick & Gefsky**

ATTORNEYS AT LAW | SINCE 1919

Four Gateway Center, Suite 2200
444 Liberty Avenue, Pittsburgh, PA 15222
P 412.281.5423  F 412.281.8264
www.smgglaw.com

mgaetani@smgglaw.com

December 20, 2019

Michael A. Goldstein, CPA
Chief Financial Officer
Walnut Capital Management
5500 Walnut Street, Suite 300
Pittsburgh, PA  15232
mgoldstein@walcap.com

     RE:   Nathan Rice, Inc.

Dear Mr. Goldstein:

     This letter is to confirm our conversation of December 20, 2019, concerning the controlling ownership of Nathan Rice, Inc. ("NRI"). Our client, Edward Rice, is the trustee of the Sidney David Rice Irrevocable Trust, Dated November 2, 2015 (the "Trust") and is the president of NRI. The Trust owns a 54.14% interest in NRI and, therefore, is the controlling majority shareholder.

     It has come to our attention that NRI's minority shareholder, Herbert L. Rice, and his daughter, non-shareholder Suezette Rice, have requested that you provide them with certain mortgage documentation related to Hempstead Road Associates. I can confirm that this request was not made or authorized by NRI, the Trust, or Edward Rice.

     Should you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

Michael P. Gaetani

MPG/plw

cc:    E.J. Strassburger, Esq. (via email only)
       Edward Rice

Your Goals | Our Priority

E. Rice 233